584 So.2d 743 (1991)
Jeffrey Joseph LADNER
v.
STATE of Mississippi.
No. 89-DP-00855.
Supreme Court of Mississippi.
July 17, 1991.
*746 Blewett W. Thomas, Gulfport, James W. Craig, Jackson, for appellant.
Mike C. Moore, Atty. Gen., Marvin L. White, Jr., Asst. Atty. Gen., Charlene R. Pierce, Sp. Ass't Atty. Gen., Jackson, for appellee.
En Banc.
ROY NOBLE LEE, Chief Justice, for the Court:
Jeffrey Joseph Ladner was indicted as an habitual offender by the Hancock County Grand Jury in February of 1987 for capital murder committed during the commission of robbery and was extradited from Louisiana to Hancock County, Mississippi. Pretrial motions to exclude the death penalty, to suppress physical evidence, and to suppress testimony were filed and heard in a four (4) day hearing. Trial commenced on October 19, 1987, and the jury returned a guilty verdict on October 23, 1987. After hearing evidence on aggravating and mitigating factors in the sentencing phase of the bifurcated trial, the jury imposed the sentence of death. Ladner has appealed to this Court and presents twenty-seven (27) issues for decision.

FACTS

THE CRIME
Mrs. Jeannette Holden, the victim in this case, was the owner of the Brass Anchor Lounge in Waveland, Mississippi, and lived next door to the Lounge in a trailer. On Monday, November 10, 1986, Holden's daughter, Tessie Barnes, stopped by her mother's home for a visit about 10:00 p.m. She noticed that her mother was wearing a particular ring with a diamond in a domeshaped mounting along with numerous other rings.
Sometime after Tessie left, Jeffrey Ladner, who had been seen in the Lounge on several occasions, rang the doorbell at Holden's trailer and the door was opened by Mrs. Holden's elderly mother, Dorothy Tassin, who was spending the night there. Ladner shot Mrs. Tassin in the head, killing her and causing her false teeth to break and to be partially ejected from her mouth. She fell in the hall with her walking cane by her side.
Ladner went to the master bedroom where Jeannette Holden was screaming for her life and killed her by shooting her in the head at close range. Ladner then went to the kitchen and dumped bay leaves out of a sack in order to use the sack as a container for Holden's jewelry.
On Tuesday, November 11, 1986, Tessie Barnes went by Holden's trailer to pick her up for an appointment they had made to go to a jewelry show. Barnes found the bodies of her mother and grandmother and found a pile of bay leaves on the kitchen floor. There were no rings on Holden's body and other pieces of her jewelry were missing.

THE INVESTIGATION
Delbert Seay, Chief Criminal Investigator of the Hancock County Sheriff's Office, was in charge of the investigation. His team found no useful fingerprints at the scene or other such evidence which would aid the investigation. His first break came on November 25, 1986, from information provided by Sergeant Larry Antoine of the Louisiana State Police that some of the jewelry from the robbery might be at Alpine Jewelry Store in Metairie, Louisiana. Tessie Barnes and her brother, Dennis Grabert, went to Alpine Jewelry Store in Metairie and identified Holden's dome shaped mounting from which the stone had been removed. Louisiana and Mississippi law enforcement officials met the victim's son and daughter at the jewelry store, interviewed store personnel, and conducted a photo lineup. The officers learned from the jewelry store personnel that the ring had been brought in by Jeff Ladner. The jewelry store records also contained Ladner's *747 address and telephone number. On the basis of this information, the officers obtained a warrant to search Ladner's residence for other stolen jewelry and for the murder weapon, a .32 revolver.
The search warrant was executed at Ladner's apartment in River Ridge, Louisiana, by Louisiana and Mississippi officers in the late night hours of November 26 and early morning hours of November 27, 1986. Tessie Barnes and Dennis Grabert waited in a car outside the Ladner residence and Seay took jewelry from the Ladner house for them to determine whether any of it belonged to their mother. Barnes was able to identify some of the jewelry as belonging to her mother and was able to definitely say that some did not belong to her.
Ladner's wife, Candace, informed officers that her husband kept a gun at the home of her parents, the Schwankharts. The officers went to the Schwankhart home and the Schwankharts turned over a.32 revolver which they said Ladner had left with them. They said that Ladner came for the revolver, ostensibly to go rabbit hunting, on November 9, 1986, and returned it to the Schwankhart house on November 11th or 12th. The revolver was later identified as the weapon that fired the bullet which had killed Dorothy Tassin. (The bullet which killed Holden had fragmented and was not useful for an identification test.)
While they were still at the Schwankhart home, Sylvia Stewart, Candace's sister, also turned over to the police Holden's gold nugget watch which she had purchased from Ladner on Tuesday afternoon following the murder.
The jewelry identified as Holden's was seized and Ladner was arrested by Louisiana authorities in connection with the stolen jewelry and was taken to the Gretna, Louisiana, jail for a few days before being jailed in the Jefferson Parish Correctional Center. Detective Sergeant Don English of the Jefferson Parish Sheriff's Office was informed by Eddie Prevost, an inmate, that Ladner had told Prevost about committing the two murders in Mississippi. Until he talked with Prevost, Sergeant English did not know about the Hancock County crime. Prevost was a third floor "hall man," who had informed in the past and had testified against fellow inmates on two prior occasions, but who was promised nothing and given no reward for testifying in Ladner's case.
There is no showing in the record that police directed Prevost to question Ladner. Ladner's being on the same "pod" with Prevost for a time was apparently fortuitous. Ladner was first placed in a third floor "pod" and, when he requested a change, he was moved to Prevost's "pod." The Louisiana authorities told the Hancock County authorities of Ladner's admissions to Prevost and the Mississippi authorities went to Louisiana and took a statement from Prevost.

PART I

GUILT PHASE

1. A SEARCH WARRANT WAS OBTAINED FOR THE APPELLANT'S RESIDENCE AS A RESULT OF AN UNDULY SUGGESTIVE PHOTO LINEUP, WITH ALL EVIDENCE OBTAINED AS A DIRECT RESULT OF THIS WRONG-DOING BEING POISONOUS FRUIT.
Ladner challenges probable cause for the issuance of the warrant to search his residence, claiming that the warrant was issued, at least in part, on the basis of identification which was made after the witness was shown an impermissibly suggestive photo array. He refers to the occasion when Louisiana officers conducted a photographic lineup with one of the owners of Alpine Jewelry Store, Mrs. Brignac, and with Mrs. Majeau, a clerk.
The photographic lineup was not a necessary part of the determination for probable cause to issue the search warrant of Ladner's residence. The Louisiana authorities had received word from an informant that Ladner had taken jewelry from the Hancock County crime to the jewelry store; they had the victim's son and daughter identify the jewelry at the store and describe their mother's ring; the store's *748 records showed that the ring had been brought in by Ladner and reflected Ladner's address and telephone number. Those facts were sufficient to warrant the belief of persons of reasonable caution that the officers had reasonable cause to search the premises. Illinois v. Gates, 462 U.S. 213, 238-39, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527, 548 (1983); Bevill v. State, 556 So.2d 699, 712 (Miss. 1990); Stokes v. State, 548 So.2d 118, 123 (Miss. 1989), cert. denied, ___ U.S. ___, 110 S.Ct. 742, 107 L.Ed.2d 759 (1990); Hall v. State, 455 So.2d 1303, 1304 (Miss. 1984).

2. THE APPELLANT'S WIFE WAS COERCED BY LAW ENFORCEMENT OFFICERS TO PROVIDE PRIVILEGED INFORMATION ON HER HUSBAND IN DISREGARD FOR HIS SPOUSAL PRIVILEGE.
When the defense sought to suppress the gun and the watch, the lower court conducted a lengthy suppression hearing at which testimony was taken from Officers Donald English, Larry Antoine, Walter Wolf and James Wong, all from Louisiana; and from Delbert Seay, Sheriff Ronnie Peterson, and Glen Strong, all Mississippi law enforcement officers; and from the Schwankharts, Sylvia Stewart, Candace Ladner, and Jeffrey Ladner, the appellant. Candace Ladner, wife of the appellant, told the police that Ladner kept a gun at the home of her parents, the Schwankharts. She telephoned her parents and told them the police wanted to come and get the gun. The police went to the Schwankhart's home where the gun had been set out by the door. Candace Ladner also went to her parent's house and, while there, telephoned her sister, Sylvia Stewart, who lived next door to the Schwankharts to come over and bring the watch she had purchased from Ladner. The police spent a long period at the Schwankhart's home, talking with them, Candace Ladner, and Sylvia Stewart. The Schwankharts and Stewart gave testimony which indicated that the atmosphere in the Schwankhart home was anything but coercive.
The trial judge found that no coercion was used against Candace Ladner and that there was no violation of spousal privilege. This Court cannot say that finding was manifestly wrong. Lockett v. State, 517 So.2d 1317, 1328 (Miss. 1987), (citing Frost v. State, 483 So.2d 1345, 1350 (Miss. 1986)), cert. denied, 487 U.S. 1210, 108 S.Ct. 2858, 101 L.Ed.2d 895 (1988).
We have been cited to no case in which this Court has extended the spousal privilege to require suppression of physical evidence which has been obtained by law enforcement officers as a result of their conversations with a spouse. We do not find in this case a violation either of the statute concerning spousal competency, Miss. Code Ann. § 13-1-5 (Supp. 1990), or the evidence rule concerning the husband-wife privilege, M.R.E. 504. Rule 504 gives a defendant the privilege of prohibiting his or her spouse from testifying as to any confidential communication between the spouses. Neither an out-of-court statement nor trial testimony of his wife was admitted against Ladner. The location of the gun and the watch do not fall within any protected class of communication; there was knowledge by persons other than the husband and wife of the whereabouts of the items. The Schwankharts had possession and control of the gun at the time it was turned over to the police and Sylvia Stewart had possession and control of the watch at the time she turned it over to the police. Candace Ladner was present when the watch was sold to Sylvia and she had talked with her parents about Ladner's keeping a gun at their house.
The issue is resolved against the appellant.

3. THE APPELLANT WAS INTERROGATED BY A JAILHOUSE SNITCH WHILE INCARCERATED IN JEFFERSON PARISH JAIL, AND IT WAS ONLY THROUGH THE USE OF THIS INFORMANT'S TESTIMONY THAT THE PROSECUTION WAS ABLE TO AVOID HAVING TO TRY THIS CASE ENTIRELY UPON CIRCUMSTANTIAL EVIDENCE.
Ladner contends that he was interrogated by Eddie Prevost, another Jefferson *749 Parish Correctional Center inmate, in violation of his Sixth Amendment right to have counsel present during interrogation. Ladner was first placed in a third floor "pod" and he requested a change. Thereupon, he was moved to Prevost's "pod." Subsequently, Eddie Prevost informed Detective Sergeant Don English that Ladner told him about committing two murders in Mississippi. Up until that time, Detective English knew nothing about the murders having been committed and there is no evidence in the record that the police directed Prevost to question Ladner.
Prevost did say that he had a "contract" with law enforcement officers, and, at one point, claimed that he had a written contract. He consistently denied that he was expected to provide information in return for whatever "contract" he had with representatives of the State of Louisiana. The record does indicate that Prevost was kept in the Jefferson Parish Correctional Center, instead of being transferred to Angola Prison, for his safety. The trial judge was diligent in attempting to learn of the nature of any contract which Prevost might have had with any law enforcement officer and concluded that Prevost was not acting as an agent for, or to obtain information for the police. Page v. State, 495 So.2d 436 (Miss. 1986), upon which Ladner relies, is distinguishable from the case at bar. In Page, a police officer placed a body transmitter on the co-defendant, sent him to talk with the defendant and monitored the recorded conversation. There is no evidence in the case at bar that the police actively solicited any action by Prevost or gave him anything in return for any information which he provided.
The issue is resolved against the appellant.

4.

A. THE STATE OF MISSISSIPPI FAILED TO OBTAIN AND DISCLOSE THE FULL TERMS OF ANY DEAL WITH THE INFORMANT, EDWARD PREVOST, AND ACCORDINGLY DENIED THE APPELLANT ADEQUATE OPPORTUNITY TO CROSS-EXAMINE THIS WITNESS.

B. IT WAS REVERSIBLE ERROR FOR THE COURT TO DENY THE APPELLANT'S REQUEST FOR A REASONABLE CONTINUANCE AS A RESULT OF THE STATE'S FAILURE TO COMPLY WITH DISCOVERY ORDERED BY THE COURT REGARDING THE INFORMANT PREVOST.
Prevost originally testified at the suppression hearing on direct examination that he had a "contract with the Department of Corrections to do [his] time in Jefferson Parish." He further said that there was no agreement that he was to seek out information from specific inmates and that nobody had promised him anything in connection with the Ladner case. There was extensive cross-examination about Prevost's prior offenses and his prior activities as an informant, and it was established that Prevost was the only sentenced prisoner in the parish jail. Part of the cross-examination follows:
Q. But you're down there because you've got a contract with the Department of Corrections?
A. Right.
Q. Now, what is that contract? Is it a written contract?
A. It is, yes.
Q. Where is it?
A. I don't have it with me. It's at the jail.
Q. What?
A. It's at the jail.
Q. It's at the jail. Now, you got that contract with the Department of Corrections because you've testified against so many people.
A. No, I did not.
After Prevost had testified, Detective Donald English testified as follows:
Q. Now, after the morning hearing, I asked you to call the Jefferson Parish jail and find out if there was any kind of a contract that he had with the Louisiana Department of Corrections. Did you call?
A. Yes, sir, I did.

*750 Q. Would you tell the Court what you learned?
A. I spoke to Detective Glen Jambon 
Q. Who?
A. Glen Jambon, J-a-m-b-o-n, and inquired about this contract or whatever. He advised me, upon searching the records, that there is no written contract that he knows of. The only agreement is a verbal agreement that Eddie Prevost was to remain in the Jefferson Parish Correctional Center at the request of the Sheriff.
In our view, the record reflects that there was no contract, written or oral, between the officers and Prevost that he remain in the jail for the purpose of informing them on prisoners, particularly Ladner.
Since there was no deal to give Prevost special treatment in return for his testimony against Ladner, a continuance to require the State to produce the terms of the deal would be meaningless. Sims v. State, 512 So.2d 1256, 1259 (Miss. 1987).
The issues are resolved against the appellant.

5. IT WAS ERROR OF THE LOWER COURT NOT TO GIVE A CIRCUMSTANTIAL EVIDENCE INSTRUCTION IN THIS CASE WHERE THE ONLY CONCEIVABLE DIRECT EVIDENCE AGAINST THE APPELLANT WAS THE TESTIMONY OF A JAILHOUSE SNITCH.
Ladner has attacked the testimony of Eddie Prevost in preceding issues. This Court has affirmed the action of the lower court in declining to suppress that evidence and the statement received from Ladner by Prevost. The present issue amounts to a continuation of the contention.
A circumstantial evidence instruction must be given only when the prosecution can produce neither an eyewitness nor a confession/statement by the defendant. Clark v. State, 503 So.2d 277, 279 (Miss. 1987). The "confession" which constitutes direct evidence of a crime is not limited to a confession to a law enforcement officer but also includes an admission made to a person other than a law enforcement officer. Mack v. State, 481 So.2d 793, 795 (Miss. 1985). In Holliday v. State, 455 So.2d 750, 752-53 (Miss. 1984), a witness testified that he had overheard the defendant say to another person that he had killed his wife. This Court held that the circumstantial evidence instruction was not required. See Foster v. State, 508 So.2d 1111, 1115 (Miss. 1987) (Court held that without "jailhouse confession" the case would have been entirely circumstantial).[1]
The trial judge conducted a thorough suppression hearing and gave the defense every opportunity to put on evidence in support of the motion to suppress Prevost's testimony. He granted the defense instructions which charged the jury to view that testimony with caution:
Eddie Prevost has testified in this case and his testimony is to be considered and weighed with great care and caution. In making this determination you may consider the witness' bias or interest. You may give it such weight and credit as you deem it is entitled.
The lower court did not err in refusing to grant a circumstantial evidence instruction.

6. THE DISTRICT ATTORNEY ALLOWED IMPERMISSIBLE AND IRRELEVANT FACTORS TO ENTER INTO HIS DECISION TO AVOID PLEA BARGAINING WITH THIS APPELLANT AND SEEK THE MAXIMUM PENALTY FOR CAPITAL MURDER.
Ladner contends that the district attorney's discretion in determining to seek the death penalty amounts to "selective prosecution," which results in "wanton" or capricious imposition of the death penalty. Ladner's pre-trial motion sought to "exclude the death penalty on account of the arbitrary use of prosecutorial discretion in the plea bargaining process in Hancock County." At the pre-trial hearing, Ladner *751 had the opportunity to introduce evidence that the death penalty was sought in an arbitrary and capricious manner in Hancock County and the other counties in the district. He examined the district attorney and elicited testimony that the wishes of the victim's family could influence the decision to enter into a plea bargain. However, the district attorney's testimony was that a great number of other factors were also considered by him in deciding whether or not to seek the death penalty. He testified that, in addition to considering the nature of the crime, the age and criminal history of the defendant, the nature and quality of the evidence in the case, he also considered advice from law enforcement officers, his staff, and other members of the community as well as the wishes of the victim's family.
After full hearings, the lower court overruled the motion. In Culberson v. State, 379 So.2d 499 (Miss. 1979), cert. denied, 449 U.S. 986, 101 S.Ct. 406, 66 L.Ed.2d 250 (1980), an accomplice was permitted to plead to manslaughter while the trigger man (Culberson) was given the death penalty. The question for the Court in Culberson was presented in conducting a proportionality review in accordance with Miss. Code Ann. § 99-19-105(3)(c) (Supp. 1990) to determine "whether the sentence of death [was] excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." Although not confronted with the same question as presented here, the Culberson Court found that the different sentences imposed on the two participants did not render the imposition of the death penalty excessive, disproportionate, or capricious. Id. at 510. If prosecutors must have discretion in cases involving multiple defendants, it is difficult to see how prosecutional discretion in single defendant cases could be circumscribed. In McCleskey v. Kemp, 481 U.S. 279, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987), the U.S. Supreme Court addressed a similar issue and stated the following:
McCleskey's argument that the Constitution condemns the discretion allowed decisionmakers in the Georgia capital sentencing system is antithetical to the fundamental role of discretion in our criminal justice system. Discretion in the criminal justice system offers substantial benefits to the criminal defendant. Not only can a jury decline to impose the death sentence, it can decline to convict or choose to convict of a lesser offense. Whereas decisions against a defendant's interest may be reversed by the trial judge or on appeal, these discretionary exercises of leniency are final and unreviewable. (footnote omitted) Similarly, the capacity of prosecutorial discretion to provide individualized justice is "firmly entrenched in American law." (citation omitted) As we have noted, a prosecutor can decline to charge, offer a plea bargain, (footnote omitted) or decline to seek a death sentence in any particular case. (citation omitted) Of course, "the power to be lenient [also] is the power to discriminate," (citation omitted) but a capital punishment system that did not allow for discretionary acts of leniency "would be totally alien to our notions of criminal justice." (citation omitted)
McCleskey at 311-12, 107 S.Ct. at 1777-78, 95 L.Ed.2d at 291.
In the case at bar, the defense introduced no evidence that the prosecutor's discretion in deciding to seek the death penalty was systematically biased along any criterion or set of criteria. The evidence showed that the determination to seek the death penalty was made on a case-by-case assessment of the facts and circumstances involved. The contention is rejected.

7.

A. THE APPELLANT WAS PREJUDICED AS A RESULT OF THE FAILURE OF THE STATE TO DISCLOSE A SECOND STATEMENT BY THE JAILHOUSE INFORMANT AND TO PROVIDE OTHER EXCULPATORY EVIDENCE.

B. IT WAS REVERSIBLE ERROR FOR THE COURT TO DENY THE APPELLANT'S REQUEST FOR A REASONABLE CONTINUANCE AS A RESULT OF THE STATE'S FAILURE *752 TO COMPLY WITH DISCOVERY ORDERED BY THE COURT REGARDING THE INFORMANT PREVOST.
Several days prior to December 15, 1989, Detective Sergeant Don English of the Jefferson Parish Sheriff's Department, at the request of Deputy Chief Eugene Fields, picked up Prevost from the Jefferson Parish Correctional Center and took him to the Detective Division where Prevost told the detectives he had knowledge of information concerning the double homicide in Hancock County. English testified that, during the interview with Prevost, the witness mentioned there were bay leaves on the kitchen floor of the house trailer. He made no written report of his interview with Prevost but relayed the results of it to Detective Seay in Hancock County. English was present on December 15, when Officers Seay and Strong took a tape recorded statement from Prevost. According to him, five or six days later, the officers returned to Louisiana and took a taped statement from another inmate (Navarre) and on that occasion saw Prevost for a few minutes but took no formal statement from him. English said that it was on the second interview that Prevost mentioned the bay leaves.
After considering the arguments of counsel concerning Ladner's allegation that the State had violated the discovery rule, the trial judge found there had not been such a violation in regard to the bay leaves. The point was raised again in the motion for new trial and the trial judge again found that there had been no discovery violation:
THE COURT: ... In all candor, the State  the defense counsel in the motions prior to trial had ample opportunity to question Prevost. And in fact, they had a copy of the entire file on this defendant. That is true, correct, gentlemen?
MR. CARANNA: Yes, sir.
THE COURT: Everything the State had in its possession, the State gave to defense counsel?
MR. THOMAS: Yes, sir.
... .
THE COURT: And I distinctly recall back on the motions, that the defense counsel deliberately, in fact, objected to the State even going into the testimony that the witness would give as to what Ladner allegedly told him.
And it was obvious to me that defense counsel knew what the testimony was, and I think the motion was just frankly a pretext motion. It was almost like they tried to shut the State down so that later on they could say that they didn't know because they didn't want to know... . I think they knew, but they wanted to say they didn't know.
Defense counsel proceeded to cross-examine Ladner on the issue of the bay leaves without asking for a continuance. The defendant in this case did not show that his trial tactics would have been any different had he known Prevost would testify about bay leaves.
Ladner also contends that the State violated Miss.Unif.Crim.R.Cir.Ct.Prac. 4.06 in that it failed to provide potentially exculpatory material: (1) information from tape recordings from the victim's telephone answering machine, and (2) information that the tire tracks located at the crime scene did not match that of Ladner's car. The issue of recorded telephone conversations was brought up by defense on cross-examination of Officer Seay. The questioning established only that the victim had an answering machine and that the law enforcement officers had listened to the tapes. There was no motion for continuance for the defense to locate and listen to the tapes; there was no further mention in the record of whether the tapes were produced and whether the defense listened to them; and there was no motion for time for the defense to deal with any new material. Sheriff Peterson testified that the tapes had no relevance to the case at bar.
Detective Seay, on direct examination, testified to the steps he had taken as chief investigating officer in charge of the scene. He said he had taken photographs and casts of the tire prints outside the trailer but that the tracks had proved of no value in the investigation. There was no objection *753 to his testimony. On cross-examination, Seay testified that he had compared the tire tracks from the scene with Ladner's vehicle and that the tracks were not made by Ladner's vehicle.
Ladner introduced testimony about the tapes and there was evidence that the defense knew about the tapes prior to trial but had not sought to compel the State to produce them or allow the defense to listen to them. The defense did not object to the introduction of testimony about the tire tracks and did not ask for a continuance to evaluate the evidence. There was no showing that the defense strategy or theory would have been any different if this evidence had been made available prior to trial.
We are of the opinion that there is no merit in these issues.

8. THE COURT ALLOWED IMPERMISSIBLE EMOTIONS TO BE DISPLAYED DURING THE TESTIMONY OF THE VICTIM'S DAUGHTER.
Tessie Barnes, the daughter of the victim, Jeanette Holden, was the individual who discovered the bodies of the victims when she came back to pick up Mrs. Holden for the purpose of attending a jewelry auction. Her testimony related to the scene and conditions surrounding it and was relevant to the presentation of the State's case. On direct examination of Tessie Barnes, she began to weep and the court recessed in order to allow her time to regain her composure before continuing her testimony. Ladner contends that her display of emotion was prejudicial and that the lower court should have declared a mistrial. Rushing v. Butler, 868 F.2d 800 (5th Cir.1989), is distinguishable from the case at bar and lends no support to that contention. In Rushing, the prosecutor, in a sentencing hearing, called family members to testify to the victim's good personal qualities and to the emotional distress they were experiencing as a result of the crime. In the case at bar, the testimony of Tessie Barnes was elicited not as a family impact statement but to prove the conditions at the crime scene. Evans v. State, 422 So.2d 737, 743 (Miss. 1982), involved a capital case in which the victim's mother and brother sobbed, cried and were emotional on the witness stand while in the process of giving relevant and probative evidence. This Court found no reversible error in the jury's having seen and heard the family members' distress.
The trial judge is in a better position to assess the effect of such an incident than is this Court on appeal, and this Court will not reverse on the failure to grant a mistrial unless the trial judge abused his discretion in overruling the motion for a mistrial. Horne v. State, 487 So.2d 213, 214-15 (Miss. 1986). The lower court in the present case did not abuse its discretion in declining to grant a mistrial or a new trial.

9. THERE WAS ERROR IN ALLOWING THE ADMISSION INTO EVIDENCE OF IRRELEVANT PHOTOGRAPHS FROM THE MURDER SCENE WHERE ALL FACTORS RELEVANT TO CHARGES AGAINST THE APPELLANT HAD BEEN STIPULATED BY DEFENSE AS BEING ACCURATE AND TRUTHFUL.
Ladner complains of the introduction into evidence of four (4) photographs by the State. Exhibit 20-E is a photograph of the victim introduced to identify some of the jewelry which was taken in the robbery. Exhibits 21 and 25 are photographs of the victim's pajama-clad body, which the State asserts were relevant to show the details surrounding the commission of the murder and the fact that there was no jewelry on the body. Exhibit 66 shows only a walking cane lying on the floor of the victim's residence. The rest of the picture showing the body of Holden's mother, the other victim, was excised. There was no claim that the photographs were gruesome.
The admissibility of photographs rests within the trial judge's sound discretion. This Court will not reverse a lower court on the ground that photographs of the deceased were admitted into evidence, unless *754 the lower court abused its discretion. Marks v. State, 532 So.2d 976, 980 (Miss. 1988); McFee v. State, 511 So.2d 130, 134-35 (Miss. 1987).
There is no merit in this issue.

10. THE PROSECUTOR'S COMMENT ON THE APPELLANT'S FAILURE TO TESTIFY VIOLATES MISSISSIPPI LAW AND THE FIFTH AND FOURTEENTH AMENDMENTS TO THE U.S. CONSTITUTION.
This Court has made it clear that direct comment on a defendant's failure to testify is constitutionally impermissible and constitutes error. Griffin v. State, 557 So.2d 542, 552 (Miss. 1990); Shook v. State, 552 So.2d 841, 851 (Miss. 1989); Monroe v. State, 515 So.2d 860, 865 (Miss. 1987). Further, the prosecutor is also prohibited from referring by innuendo and insinuation to the defendant's failure to testify. Jimpson v. State, 532 So.2d 985, 991 (Miss. 1988) (citing Wilson v. State, 433 So.2d 1142, 1146 (Miss. 1983)). What constitutes such error is, however, to be determined from the facts and circumstances of each case. Peterson v. State, 357 So.2d 113, 117 (Miss. 1978). The question here is whether or not the comment of the prosecutor can reasonably be construed as a comment upon the failure of Ladner to take the stand.
In Shook, supra, the defense claimed that the prosecutor impermissibly commented on Shook's failure to testify when, in closing argument, he said:
At this point in the trial neither you nor I know if the defendant contends he's not guilty because he didn't shoot the gun into that house or if the defendant claims he's not guilty because he did shoot the gun into the house and he could not appreciate the wrongfulness of that act when he fired the gun.
Id. at 851. This Court found that "[t]he comments in the case at bar [were] comments on the defense presented, or lack thereof, and not comments on the failure to testify" and held the prosecutor's statement did not require reversal. Id. (citing Jimpson at 991).
In Griffin, supra, the prosecutor made the following statement in closing argument:
[T]hey tell you, there's one man alive today who can tell you what happened, and I agree with that. There is one person who could tell you what happened and we have  we have a statement  we have a statement from him. We have a confession, an oral confession, we have a written confession, yes, we do.
Id. at 552. In a five to four opinion, the Court held that the above argument was an impermissible comment on the defendant's failure to testify, which required reversal.
In the case at bar, the prosecutor called the jury's attention to jury instruction S-1, which set out the elements of the crime of capital murder. He went through each of the elements and recalled the State's proof: (1) that the killing occurred in Hancock County; (2) that the deceased had been a living person; (3) that Ladner had shot the victim with a deadly weapon (a gun); and (4) that the shooting had caused her death. The prosecutor's statement on the last element of the crime is argued here as error:
The fifth thing, and the last element that we have to prove, is that the actions of the defendant were not done in necessary self-defense. I don't believe that there's been any testimony that he acted in self-defense in the case. It's clear that that element we've met. There's no showing of self-defense in this case. Then it says: If you so believe from the evidence in this case beyond a reasonable doubt you shall find the defendant guilty of capital murder. If the State has failed to prove any one of these five elements, then you can't do it.
After considering all the facts and circumstances of this case we are of the opinion that the prosecutor was not commenting on Ladner's failure to testify, although the words "any testimony" are bother-some. In our view, the argument of the State's counsel would be to show the State had proved the five elements set forth in the instruction, rather than a comment upon the failure of Ladner to testify.
*755 The issue is resolved against the appellant.

11. THE FAILURE OF THE TRIAL COURT TO REMOVE JUROR DEGEORGE AFTER HER SHOW OF SUPPORT FOR THE PROSECUTION VIOLATED MISSISSIPPI LAW AND THE FOURTEENTH AMENDMENT TO THE U.S. CONSTITUTION
The victim's daughter, Tessie Barnes, began to weep during her testimony. She was helped down from the witness stand by her father and a friend, Blake Pablovich, while the jury was still in the courtroom. When the court recessed for the day, three courtroom observers testified that juror DeGeorge made a signal with her hand to another spectator. The spectator was Blake Pablovich.
The trial judge questioned the observers in chambers. Lana Triana testified that DeGeorge made a sweeping motion with her hand to another spectator, but did not actually see what was done with the hand. Betty Arnold testified that DeGeorge made an "OK" signal with her hand and her fingers were pointing down. Doris Cooper also testified that DeGeorge made an "OK" signal to Pablovich. Pablovich, however, denied seeing the signal.
The trial judge denied defense counsel's motion for a mistrial:
THE COURT: At this point I see no basis at all for that. If I have a conflict as to what type of gesture was made, I have an unequivocal witness that says if it was made she didn't see it and she has no connection to this case other than being over here as a friend for Tessie. You've raised the issue, so the issue to me is really, what did the juror do, and I think I ought to talk to the juror. I'll do it on the record with everybody present, or you did suggest off the record privately between me and her.
MR. NECAISE: The defendant Jeffrey Ladner  let the record show that  of course it already has it, Jeffrey  that Jeffrey Ladner is here and I'm hereby asking him does he have any objection to the Court talking to that prospective juror in chambers and no one else in here but the juror and the Judge. Do you have any objection to that taking place?
THE DEFENDANT: No.
As stated, defense counsel suggested that the trial judge question the juror off the record and the defendant readily agreed to this arrangement. The record is unclear as to what then actually transpired. The Court further said:
THE COURT: Like I say, I would prefer to wait until we break at noon and do it as casually as possible with the juror, make no big deal out of it, if it is as it appears to be, to me, no big deal. I think, frankly, what may have happened is that this girl was in the courtroom and  and I didn't see it  from what I gather she obviously was somewhat distraught over Tessie about to break down, and you know, some of the jurors may have picked up on that, and if a gesture was made maybe it was such that the juror was just trying to let that party know that, you know, she was okay. I don't know.
... .
... It's not impossible that one of the jurors could have been making a hand motion to somebody else in the audience, a friend or relative. The problem with things like this from  you see from three people here is everybody looks at things differently or sees things differently. I realize, of course, that these two women, three women who testified are here for Jeffrey Ladner and they're highly sensitive.
It's apparent from the beginning of this trial that Mr. Ladner's family and friends are obviously concerned over this case and sensitive to anything that may appear to be improper. I don't think you gentlemen would disagree with that.
The trial judge, during the conference in chambers, determined that the alleged conduct was of no consequence. He was of the opinion that no reversible error was committed and that no prejudice resulted to the appellant. The determination of the partiality of a juror is left to the sound *756 discretion of the trial judge. Schwarzauer v. State, 339 So.2d 980, 982 (Miss. 1976). We are of the opinion that the lower court did not err in declining to grant a mistrial.

12. THE LOWER COURT'S EXCESSIVE INVOLVEMENT IN THE CASE FOR THE PROSECUTION CONSTITUTED REVERSIBLE ERROR.
Ladner complains of five instances where the judge wrongfully assisted the prosecution during the trial. They follow:
(1) The prosecutor was questioning Anthony Schwankhart about the night that the police came to search his house for Ladner's gun and the prosecutor was unable to find the Consent to Search document. In an effort to speed the trial up, the trial judge instructed him to go ahead and ask Schwankhart about the document and introduce it later. The prosecutor found the document and had it marked State's Exhibit 4 for identification.
(2) The prosecutor attempted to introduce into evidence a picture of Barnes' mother, the victim. Defense counsel objected to its introduction and the trial judge sustained the objection, explaining his reasoning for doing so. The defense objected to the explanation.
(3) During the testimony of Delbert Seay, the prosecutor was attempting to introduce a sketch of the rooms in the victim's mobile home prepared by Jim Odom. Chief Investigator Delbert Seay had helped Odom in taking the proper measurements, but he did not draw the sketch himself. Defense counsel objected to the introduction of the sketch and requested an opportunity to voir dire the witness. At the conclusion, the lower court asked the question, "Does it fairly and accurately depict the scene and condition as it existed on the date and time in question?" The witness answered that it did. Counsel for the defense objected to the question by the court.
(4) Investigator Seay was testifying about the night he went to Schwankhart's home to search for Ladner's gun. The trial judge sustained defense counsel's objection to leading, but in an attempt to speed up the trial, he asked Seay the question: "What, if anything, did you do once you reached the door?" Counsel for Ladner objected that the court was telling the prosecutor how to ask questions without leading.
(5) During the testimony of Investigator Delbert Seay, Ladner's counsel moved for a mistrial after the judge called a bench conference and instructed counsel for the State to, in essence, be careful of where he was going because he was about to open up something that might be dangerous to him. The judge instructed the prosecutor to approach the witness and tell the witness not to say a certain thing that might prejudice the jury; and in full view of the jury, the prosecutor approached the witness at the witness chair and whispered in his ear in the presence of the jury and then stepped back and asked him the question.
Ladner relies on West v. State, 519 So.2d 418 (Miss. 1988). The case is distinguishable from the case at bar. In West, this Court found "thirty (30) instances where the trial judge improperly, or unnecessarily, interjected himself into the proceedings." Id. at 421. The instances included coaching the district attorney, questioning a witness when the district attorney's questions were ineffective, and commenting on the evidence. Id.
We recognize that a trial judge must be careful not to influence the jury and have said so on numerous occasions:
It is a matter of common knowledge that jurors . .. are very susceptible to the influence of the judge.... [J]urors watch closely his conduct, and give attention to his language, that they may, if possible, ascertain his leaning to one side or the other, which, if known, often largely influences their verdict. He cannot be too careful and guarded in language and conduct in the presence of the jury, to avoid prejudice to either party.
Green v. State, 97 Miss. 834, 838, 53 So. 415, 416 (1910). See also West at 422-23; Thompson v. State, 468 So.2d 852, 854 *757 (Miss. 1985). We have carefully read the record with reference to the complaints here made by Ladner as to the trial judge's conduct of those matters. We are of the opinion that neither singly nor collectively do they constitute reversible error.
The most egregious incident occurred when the trial judge instructed the prosecutor to whisper in the witness' ear not to mention a certain item in the presence of the jury. It is apparent, however, that he foresaw the possibility that the witness might blurt out a prejudicial statement and he was attempting to insure the defendant a fair trial by not permitting the witness to insert prejudicial matters into the record. The better procedure would have been to excuse the jury, hear the questions and answers in the jury's absence, ascertain whether or not the defense had objection, and then rule upon the objection.
We emphasize that trial judges must not leave any impression with the jury that they are partisan to either side of a case. The appearance of fairness and non-partiality must surround every situation in a trial, even though they may result in delay of the trial.
The issue is resolved against the appellant.

13. THE COURT'S DENIAL OF EXPERT ASSISTANCE VIOLATED THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE U.S. CONSTITUTION.
Ladner filed a motion requesting a private mental examination. The request was denied, but the lower court appointed Dr. Henry Maggio, M.D., to make a determination of, inter alia, Ladner's intelligence quotient. Dr. Maggio reported that there were no hallucinations, delusions, or gross thought disorder; that Ladner's intelligence was quite normal as seen by his ability to do serial 7's, six digits forward and reversed, and to give reasonable and varied answers on similarities. He found that Ladner did not suffer from any severe or serious psychiatric problems; that his intelligence was average or above; that he was mentally competent at the time of the alleged crime; and that he was able to understand the legal process, the nature and consequences of the charges that were brought against him; and that he was competent to assist counsel in his defense.
In Ake v. Oklahoma, 470 U.S. 68, 83, 105 S.Ct. 1087, 1096, 84 L.Ed.2d 53, 66 (1985), the United States Supreme Court held that when a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, the State must assure the defendant access to a competent psychiatrist. In the case at bar, Ladner did not attempt to use an insanity defense and his sanity was not a "significant factor" at trial. In Nixon v. State, 533 So.2d 1078 (Miss. 1987), cert. denied, 490 U.S. 1102, 109 S.Ct. 2458, 104 L.Ed.2d 1012 (1989), the defendant filed a motion for psychological assistance basing his claim on Ake. In denying the motion, this Court said:
There are several important factors distinguishing Ake from the instant case. Unlike Ake, Nixon did not attempt to use the insanity defense. Had he done so, the county would have been obligated to pay the cost of an examining psychiatrist of the court's choosing. Miss. Code Ann. § 99-13-11 (1972). See also Miss.Unif. Crim.R.Cir.Ct.Prac. 4.08.
Second, the State did not produce psychiatric testimony against Nixon in the penalty phase. To the contrary, in Ake, the State relied on psychiatric testimony establishing the petitioner's future dangerous behavior.
Third, Nixon failed to demonstrate that his sanity at the time of the offense was to be a significant factor at trial.
Nixon at 1096-97.
Like Nixon, Ladner did not attempt to use an insanity defense, the State did not produce psychiatric testimony against him, and he did not demonstrate that sanity was to be a significant factor at trial.
This issue is resolved against the appellant.

*758 14. THE STATE'S REPEATED REFERENCES TO THE SECOND VICTIM, DOROTHY TASSIN, VIOLATED THE EIGHTH AND FOURTEENTH AMENDMENTS AND MISSISSIPPI LAW.
Ladner contends that he was prejudiced by the State's repeated references to the second killing, that of Dorothy Tassin. The defense objected to these references. Ladner particularly complains that during closing argument at the sentencing hearing, the prosecutor made the following remarks:
MR. GOLDEN: ... I think it's clear that he went in there; it was a cold calculated murder. He went in there with the intention of getting the jewelry and he knew he was going to have to get that ring off her finger... . He knew he was going to have to kill her. He ended up killing two people. (emphasis added).
MR. NECAISE: Objection, if the Court please. We move for a mistrial.
THE COURT: Overruled.
The general rule is that evidence must be limited to the criminal activity charged in the indictment and evidence of other crimes must be excluded. Brown v. State, 483 So.2d 328, 330 (Miss. 1986); Tobias v. State, 472 So.2d 398, 400 (Miss. 1985); Donald v. State, 472 So.2d 370, 372 (Miss. 1985); Stinson v. State, 443 So.2d 869, 873-74 (Miss. 1983); Crafton v. State, 200 Miss. 10, 14, 26 So.2d 347, 348 (1946).
Exceptions have been laid down to the general rule, and have been approved numerous times. Proof of another crime is permissible where the offense charged and that offered to be proved are so interrelated as to constitute a single transaction or occurrence or a closely related series of transactions. Wheeler v. State, 536 So.2d 1347, 1352 (Miss. 1988) (citing Neal v. State, 451 So.2d 743, 759 (Miss.), cert. denied, 469 U.S. 1098, 105 S.Ct. 607, 83 L.Ed.2d 716 (1984)).
The defendant in Wheeler was charged with the aggravated assault of a police officer. During this incident, another officer was killed by the defendant. This Court held that evidence of the killing was admissible because:
[I]t was integrally related in time, place and fact with the aggravated assault of Officer Steve Reid. The two offenses arose out of a common nucleus of operative facts. "We are concerned here with the State's legitimate interest in telling a rational and coherent story of what happened ..." to Officer Steve Reid. Neal at 759.
Wheeler at 1352. See also Comment to M.R.E. 404(b).
In overruling Ladner's request for a mistrial, the trial judge stated:
As to the second victim at the scene, the two cases are so intertwined it's impossible as we discussed in pretrial, to disassociate one from the other. There must be some lapping into the second victim because the second victim was found right there at the scene with a bullet in her head, too. They can't go into the detail that they could go into if the defendant were on trial for the second victim today, but there is necessarily going to have to be some testimony that concerns itself with the other capital murder charge.
The references made regarding Tassin were necessary to tell the complete story of the crime. Both were killed in Holden's mobile home with the same gun. See Griffin v. State, 504 So.2d 186, 191-92 (Miss. 1987).
The issue is rejected.

PART II

SENTENCING PHASE

1. THE LOWER COURT'S REFUSAL TO ALLOW THE APPELLANT TO INFORM THE JURY ABOUT HIS INELIGIBILITY FOR PAROLE VIOLATED HIS RIGHTS UNDER THE U.S. AND MISSISSIPPI CONSTITUTIONS
The capital murder indictment of Ladner charged him as an habitual offender under Miss. Code Ann. § 99-19-81 (Supp. 1990). Under that indictment, if the lower court found him to be an habitual offender *759 and the jury declined to invoke the death penalty, Ladner would be sentenced to life without parole.
At the sentencing phase, defense counsel requested an instruction that Ladner was an habitual offender and would not be eligible for parole, but withdrew the instruction prior to argument. There was no ruling on that instruction by the lower court. During oral argument, counsel for the defense attempted to argue the fact of no parole to the jury, if it returned a verdict imposing life imprisonment:
MR. NECAISE: And I want to say this to you, ladies and gentlemen of the jury: If you people see in your heart to permit him to live, he will spend the rest of his life in confinement; the rest of his life, not a short period of time that you hear so much about. No; the rest of his life.
MR. CARANNA: We object, your Honor.
THE COURT: Sustained.
MR. NECAISE: Judge, this is the 
THE COURT: Sustained.
MR. NECAISE: All right.
Ladner's status as an habitual offender was uncertain during the sentencing phase. The habitual offender hearing was held after the jury retired to consider its verdict. No ruling was rendered on the habitual offender status by the lower court until after the jury returned with its sentence of death.
Ladner contends that the lower court erred in refusing to allow him to inform the jury that he was ineligible for parole even though at that time in the trial, the court had not adjudicated his habitual offender status.
The identical issue was recently decided against the State in Turner v. State, 573 So.2d 657 (Miss. 1990), cert. denied, ___ U.S. ___, 111 S.Ct. 1695, 114 L.Ed.2d 89 (1991), and Berry v. State, 575 So.2d 1 (Miss. 1990), cert. denied, ___ U.S. ___, 111 S.Ct. 2042, 114 L.Ed.2d 126 (1991).[2] Therefore, the issue has merit and it is resolved in favor of the appellant, Ladner. The sentence and judgment imposing the death penalty are reversed and the case is remanded for a new sentencing hearing.

2. THE DENIAL OF DEFENSE INSTRUCTION D-110 AT SENTENCING VIOLATED MISSISSIPPI LAW AND THE EIGHTH AND FOURTEENTH AMENDMENTS.
In the guilt phase, the court instructed the jury as follows:
It is your duty to determine the facts and to determine them from evidence produced in open Court. You are to apply the law to the facts and in this way decide the case. You should not be influenced by bias, sympathy or prejudice. Your verdict should be based on the evidence and not upon speculation, guesswork or conjecture. (emphasis added).
Ladner does not contend that the giving of the "anti-sympathy" instruction at the guilt phase was error. He now contends, however, that the trial court erred in denying sentencing instruction D-110 which reads as follows:
The Court instructs the Jury that although at the guilt and innocent (sic) phase of the trial, you were instructed that you were not to be swayed by sympathy, at this phase of the trial you are bound by law and your oath as Jurors to consider mitigating factors. Mitigating factors are facts that, while they do not justify or excuse the crime, nevertheless in fairness, sympathy, and mercy to JEFFREY L. LADNER, must be considered by you as extenuating or reducing the degree of his blame or punishment. You may not, however, be swayed by prejudice or public opinion.
During the sentencing phase, the jury was not instructed to disregard sympathy. There was no instruction specifically instructing the jury to regard sympathy either. In Saffle v. Parks, 494 U.S. 484, 110 S.Ct. 1257, 108 L.Ed.2d 415 (1990), the United States Supreme Court held:

*760 The objectives of fairness and accuracy are more likely to be threatened than promoted by a rule allowing the sentence to turn not on whether the defendant, in the eyes of the community, is morally deserving of the death sentence, but on whether the defendant can strike an emotional chord in a juror.
Saffle, 494 U.S. at ___, 110 S.Ct. at 1264, 108 L.Ed.2d at 429. See also Pinkney v. State, 538 So.2d 329, 351 (Miss. 1988), vacated on other grounds, ___ U.S. ___, 110 S.Ct. 1800, 108 L.Ed.2d 931 (1990); Lockett v. State, 517 So.2d 1317, 1338 (Miss. 1987).
Instruction D-110 would tell the jury that they "must consider" sympathy and mercy for Ladner. In instruction C-1-S, the court informed the jury that it must consider mitigating circumstances, if any aggravating circumstances were found to exist. Instruction D-110 was cumulative, and the lower court was correct in denying it.
The contention is rejected.

3.

A. THE SENTENCING INSTRUCTION FAILED TO ADEQUATELY CHANNEL THE JURY'S DISCRETION AND MISINFORMED THE JURY REGARDING ITS CONSIDERATION OF AGGRAVATION AND MITIGATION.

B. THE SENTENCING INSTRUCTIONS REQUIRED THE JURY TO UNANIMOUSLY AGREE ON MITIGATING CIRCUMSTANCES IN VIOLATION OF THE EIGHTH AND FOURTEENTH AMENDMENTS AND MISSISSIPPI LAW.

C. THE DENIAL OF THE DEFENSE INSTRUCTIONS ON MITIGATING CIRCUMSTANCES VIOLATED MISSISSIPPI LAW AND THE EIGHTH AMENDMENT.

D. THE LOWER COURT'S DENIAL OF SENTENCING INSTRUCTION D-103 VIOLATED THE EIGHTH AND FOURTEENTH AMENDMENTS AND MISSISSIPPI LAW.

3-A
Ladner argues that the sentencing instruction C-1-S failed to inform the jury how it was to properly consider aggravating and mitigating circumstances. Instruction C-1-S reads in part as follows:
You have found the defendant, Jeffrey Joseph Ladner, guilty of the crime of Capital Murder. You must now decide whether the Defendant should be sentenced to death or to life imprisonment. In reaching your decision, you may objectively consider the detailed circumstances of the offense for which the Defendant was convicted, and the character and record of the Defendant himself.
The United States Supreme Court has held that the sentencer must consider any relevant mitigating evidence put forth on behalf of the defendant. Eddings v. Oklahoma, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982). Likewise, Miss. Code Ann. § 99-19-101(1) (Supp. 1990), as well as the decisions of this Court, provide that any relevant mitigating evidence introduced on behalf of the defendant may be considered by the jury. West, 519 So.2d at 426; Minnick v. State, 551 So.2d 77, 96 (Miss. 1988), rev'd on other grounds, ___ U.S. ___, 111 S.Ct. 486, 112 L.Ed.2d 489 (1990); Jordan v. State, 518 So.2d 1186, 1188-89 (Miss. 1987), cert. denied, 488 U.S. 818, 109 S.Ct. 57, 102 L.Ed.2d 35 (1988).
Considering instruction C-1-S in its entirety, it is apparent that the jury was properly instructed as to its duty in considering aggravating and mitigating circumstances. The jury was instructed that, if one of the aggravating circumstances was found to exist, then it "must" consider mitigating circumstances. There is no merit to Ladner's claim here.

3-B
Ladner contends that the sentencing instructions were not clear, and that the jury could have interpreted the instructions as requiring unanimity with respect to mitigating circumstances. In McKoy v. North Carolina, 494 U.S. 433, 110 S.Ct. 1227, 108 L.Ed.2d 369 (1990), the United States Supreme Court held that the requirement that there be unanimity in mitigating *761 circumstances is unconstitutional. McKoy, 494 U.S. at ___, 110 S.Ct. at 1233-34, 108 L.Ed.2d at 381. See also Mills v. Maryland, 486 U.S. 367, 384, 108 S.Ct. 1860, 1870, 100 L.Ed.2d 384, 400 (1988).
We are of the opinion that the sentencing instructions in this case required unanimity with respect to aggravating circumstances, but not as to mitigating circumstances. We emphasize here that there must be no confusion in the sentencing instructions; that aggravating circumstances for the State's case must be found unanimously and beyond reasonable doubt; and that mitigating circumstances need not be found unanimously and beyond reasonable doubt.
Objection to 3-B is rejected.

3-C
The jury was instructed as to five specific mitigating circumstances as well as the all-inclusive "any other facts" mitigating circumstance. Ladner requested the following mitigating circumstances be submitted to the jury in Instruction D-109:
1. The offense was committed while the Defendant was under the influence of intoxicating beverages and/or marijuana.
2. The offense was committed under circumstances which the Defendant believed to be moral justification or extenuation for his conduct even though the circumstances which the Defendant believed to be moral justification or extenuation for his conduct were not sufficient to constitute a defense to the crime.
... .
4. The Defendant's cooperation with the police.
The trial judge refused Instruction D-109:
THE COURT: ... D-109, I have taken this one and added to C-1-S, or I should say the State's instruction, when I redrafted it. I took the State's instruction as far as mitigation and added in the defendant's prior family history and his neglect and the age. I did not add in the defendant's cooperation with the police or, number two, that the offense was committed wherein the defendant believed there was a moral justification or extenuation. That could change if you can present something to change it. Is there going to be anything?
MR. NECAISE: No. Sir.
THE COURT Okay. Given that, I'll refuse D-109.
There was no evidence in the record that Ladner was under the influence of drugs or alcohol at the time of the crime, nor was there an evidentiary basis to support the "moral justification" circumstance or that the defendant cooperated with the police. The evidence did not support the mitigating circumstance by Ladner as set forth above. However, the jury was further instructed that it could consider any matter or aspect of the defendant's character, or any circumstance of the offense that it deemed as mitigating on behalf of the defendant.
The objection is rejected.

3-D
Ladner contends that the trial judge erred in denying sentencing Instruction D-103 which reads as follows:
The Court instructs the Jury that there is nothing which would suggest that the decision to afford an individual Defendant mercy and thereby sentence him to life imprisonment violates the laws of this state or your oath as jurors, and even if you find there are no mitigating circumstances in this case which are worthy of your consideration, then, nevertheless, you still may sentence the Defendant to life imprisonment.
Under the decisions of this Court and of Saffle, supra, the defendant has no right to a mercy instruction. Shell v. State, 554 So.2d 887, 905 (Miss. 1989) (citing Williams v. State, 544 So.2d 782, 788 (Miss. 1987)), rev'd on other grounds, ___ U.S. ___, 111 S.Ct. 313, 112 L.Ed.2d 1 (1990); Nixon, 533 So.2d at 1100; Cabello v. State, 471 So.2d 332, 348 (Miss. 1985). In Saffle, the United States Supreme Court stated that the giving of a mercy instruction results in a decision based on whim and caprice.
We are aware that some trial judges in this State have granted mercy instructions *762 and have permitted the defendant's counsel to argue the proposition of mercy before the jury in the exercise of extreme caution and in order to obviate any question of error. Nixon, supra; Clemons v. State, 535 So.2d 1354, 1365 (Miss. 1988), vacated on other grounds, 494 U.S. 738, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990).
The issue is resolved against the appellant.

4.

A. THE PROSECUTION'S CLOSING ARGUMENTS AT SENTENCING CONSTITUTE REVERSIBLE ERROR.

B. THE CUMULATIVE ERRORS IN THIS RECORD REQUIRE THAT THE CONVICTION AND SENTENCE BE REVERSED.

4-A.
Ladner claims that the prosecution made numerous improper references in its closing argument during the sentencing phase: (1) that the prosecution told the jury not to consider the mitigating circumstances; (2) that the prosecutor referred to facts not in evidence; (3) that the prosecution emphasized the lack of victim's rights as compared to defendant's rights; (4) that the prosecutor made victim impact arguments; and, (5) that the cumulation of the above errors along with the prosecution's improper references to Tassin's murder and the argument that the jury should not be merciful made the sentence unreliable.
The Eighth and Fourteenth Amendments to the Constitution require that the jury not be precluded from considering as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death. Lockett v. Ohio, 438 U.S. 586, 604, 98 S.Ct. 2954, 2964-65, 57 L.Ed.2d 973, 990 (1978). This requirement, however, does not prevent the prosecution from offering rebuttal evidence as to the existence of the mitigating circumstances. Faraga v. State, 514 So.2d 295, 304 (Miss. 1987), cert. denied, 487 U.S. 1210, 108 S.Ct. 2858, 101 L.Ed.2d 894 (1988). In the case at bar, the jury was instructed that it could consider any matter or aspect of the defendant's character or any circumstance of the offense that it deemed as mitigating on behalf of the defendant. In our opinion the remarks of the prosecutor were not to inform the jury that it should not consider the mitigating circumstances, but were rebuttal remarks, not constituting reversible error.
We have carefully reviewed the record and are of the opinion that the contention that the prosecutor referred to facts not in evidence and compared the lack of the victim's rights to defendant's rights is without merit.
Likewise, the prosecutor's argument in explaining the aggravating circumstances to the jury did not rise to the level of the victim impact statements statements denounced in South Carolina v. Gathers, 490 U.S. 805, 109 S.Ct. 2207, 104 L.Ed.2d 876 (1989), and Booth v. Maryland, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987). However, we emphasize here that, in the emotion and heat of trial and argument, prosecutors must not stray from well defined paths of argument and trial conduct, although they are not to be placed in straight jackets.

4-B.
In view of the holding hereinabove, we do not consider it necessary to discuss this issue.

5. THERE WAS IMPERMISSIBLE STACKING OF AGGRAVATING FACTORS AT THE SENTENCING PHASE OF THIS CASE.
Ladner argues that the lower court committed reversible error in double use of one aggravating circumstance or in stacking of the aggravating circumstances: (1) in the commission of a robbery and (2) for pecuniary gain. That contention has been rejected many times. Nixon at 1097; Billiot v. State, 454 So.2d 445, 465 (Miss. 1984), cert. denied, 469 U.S. 1230, 105 S.Ct. 1232, 84 L.Ed.2d 369 (1985); Leatherwood v. State, 435 So.2d 645, 650 (Miss. 1983), cert. denied, 465 U.S. 1084, 104 S.Ct. 1455, 79 *763 L.Ed.2d 772 (1984); Tokman v. State, 435 So.2d 664, 665 (Miss. 1983), cert. denied, 467 U.S. 1256, 104 S.Ct. 3547, 82 L.Ed.2d 850 (1984).
In Lowenfield v. Phelps, 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988), the petitioner sought to have his death sentence vacated on the ground that the sole aggravating circumstance found by the jury at the sentencing phase was identical to an element of the capital crime for which he was convicted. Id. at 241, 108 S.Ct. at 552-53, 98 L.Ed.2d at 579. The United States Supreme Court held that when constitutionally required narrowing of the class of persons eligible for the death penalty is accomplished by the legislative definition of capital offenses in the guilt phase (as is done in Louisiana and Mississippi), the jury's further narrowing in the sentencing phase is not constitutionally required. Id. at 241-46, 108 S.Ct. at 552-55, 98 L.Ed.2d at 579-83.
This Court also rejected the argument of doubling up or stacking in Jones v. State, 517 So.2d 1295, 1300 (Miss. 1987), vacated on other grounds, 487 U.S. 1230, 108 S.Ct. 2891, 101 L.Ed.2d 925 (1988), and Wiley v. State, 484 So.2d 339 (Miss.), cert. denied, 479 U.S. 906, 107 S.Ct. 304, 93 L.Ed.2d 278 (1986).
In practically every case, where there is a robbery/capital murder, two aggravating circumstances used are that the homicide was committed while: (1) engaged in robbery and (2) for pecuniary gain. Our Courts should closely scrutinize these two aggravating circumstances in the future, and omit using pecuniary gain, except in clearly, applicable circumstances. One aggravating circumstance is sufficient to satisfy the statute.
Therefore, we hold, and state to trial judges and prosecutors that, where the indictment charges a robbery/murder capital offense and robbery is designated as an aggravating circumstance, pecuniary gain should not be used as an aggravating circumstance unless clearly supported by the evidence. For instance, A pays B $1,000 to kill C, who has a wallet full of money. B robs C and kills him. There are two aggravating circumstances, i.e., robbery and pecuniary gain. Likewise, the aggravating circumstance that the capital offense "was committed for the purpose of avoiding lawful arrest" should not be used unless clearly supported by the evidence.

6. THE AGGRAVATING CIRCUMSTANCE "ESPECIALLY HEINOUS, ATROCIOUS AND CRUEL" WITHOUT ANY LIMITS UPON THAT INSTRUCTION, WAS ERROR.
Ladner contends that the lower court did not give a limiting instruction. The record indicates that the following language was contained in the court's C-1-S instruction:
You are further instructed that the terms "heinous, atrocious, or cruel" as used in this instruction means those situations where the actual commission of the capital felony was accomplished by such additional acts as to set the crime apart from the norm of capital felonies by the conscienceless or pitilessness of the crime which is unnecessarily tortuous to the victim.
The limiting instruction was approved by this Court in Clemons, 535 So.2d at 1363, and other reported cases.
In the case at bar, the jury failed to find that the murder was "especially heinous, atrocious or cruel" and since the jury did not base its imposition of the death penalty on this factor, the issue contains no error.
We call to the attention of the bench and bar, the United States Supreme Court's per curiam decision in Shell v. State, ___ U.S. ___, 111 S.Ct. 313, 112 L.Ed.2d 1 (1990), where the Court said:
The motion of petitioner for leave to proceed in forma pauperis and the petition for a writ of certiorari are granted. To the extent that the Mississippi Supreme Court [Shell v. State] 554 So.2d 887 [Miss. 1989], relied on the "especially heinous, atrocious, or cruel" aggravating factor in affirming petitioner's death sentence, its decision is reversed. See Maynard v. Cartwright, 486 U.S. 356, 108 *764 S.Ct. 1853, 100 L.Ed.2d 372 (1988). Although the trial court in this case used a limiting instruction to define the "especially heinous, atrocious, or cruel" factor, that instruction is not constitutionally sufficient. See Godfrey v. Georgia, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980); Cartwright v. Maynard, 822 F.2d 1477, 1489-1491 (CA10 1987), aff'd, 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988). The case is remanded to the Mississippi Supreme Court for further consideration in light of Clemons v. Mississippi, 494 U.S. 738, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990).
Berry v. State, 575 So.2d 1, 15 (Miss. 1990) (Roy Noble Lee, C.J., dissenting). Trial judges should not grant it.
Any other issues not addressed in this opinion either have no merit or probably will not occur on a re-trial of the sentencing phase.
The judgment of the lower court is affirmed on the guilt phase and is reversed and remanded for a new trial on the sentencing phase, consistent with this opinion.
GUILT PHASE: CONVICTION OF CAPITAL MURDER AFFIRMED.
HAWKINS and DAN M. LEE, P.JJ. and PRATHER, ROBERTSON, SULLIVAN, and PITTMAN, JJ., concur.
BANKS and McRAE, JJ., not participating according to Supreme Court internal rules.
SENTENCING PHASE: REVERSED AND REMANDED.
HAWKINS and DAN M. LEE, P.JJ. and PRATHER, ROBERTSON, SULLIVAN, and PITTMAN, JJ., concur.
BANKS and McRAE, JJ., not participating according to Supreme Court internal rules.
NOTES
[1] McNeal v. State, 551 So.2d 151 (Miss. 1989), is not authority for Ladner's position on this issue. McNeal was decided on other grounds and is not authority here.
[2] The writer, Chief Justice Roy Noble Lee, filed a dissent in Turner and Berry. The majority of the Court having spoken on this issue, he will follow the law as pronounced by it.