# IN THE SUPREME COURT OF MISSISSIPPI
## NO. 1999-KA-00812-SCT

*CLINT BALDWIN*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 03/27/1999 |
| TRIAL JUDGE: | HON. LEE J. HOWARD |
| COURT FROM WHICH APPEALED: | LOWNDES COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | CARRIE A. JOURDAN |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: SCOTT STUART |
| DISTRICT ATTORNEY: | FORREST ALLGOOD |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 04/12/2001 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 5/3/2001 |

**EN BANC.**

**MILLS, JUSTICE, FOR THE COURT:**

¶1. Clint Baldwin was tried and convicted in the Circuit Court of Lowndes County of capital murder and sentenced to a term of life imprisonment. He now appeals to this Court.

## STATEMENT OF FACTS

¶2. Mary Elizabeth Mosley Dill ("Liz") was the thirty-year-old wife of Bryan Dill and mother of a fifteen-month-old baby daughter named Taylor. She worked with pregnant teens at a community counseling center and was studying to be a nurse. On Easter weekend, 1996, Liz was kidnapped, raped, and murdered.

¶3. Bryan Dill reported his wife missing through a 911 call shortly after seven o' clock on the morning of Saturday, April 6, 1996. He told investigators that he had left Liz at home alone the previous evening at around 8:30 p.m. and had gone to a camp house called "the Shack," where he and his friends grilled hamburgers, drank beer, and spent the night. He returned at 5:30 the next morning to find Liz missing.

¶4. Three days later, on the afternoon of April 9, 1996, Officer Steven Beale of the Mississippi Highway Patrol was flagged down by a passing motorist on Highway 69 and led to a small field off a dirt road. There he found the mutilated, partially-decomposed, nude body of a young woman. Dental records would later prove this body to be that of Liz.

¶5. The initial investigation performed at the Dill residence the morning Liz was reported missing revealed no sign of forced entry into the house and produced no fibers, hairs, fingerprints, body fluids, or other evidence that could be used to identify a suspect. Also, there was no sign of a struggle in the home. Bryan did,

however, report a .25 caliber handgun missing.

¶6. After Liz's body was discovered, further investigation led deputies to Clint Baldwin and his brother Darnell. The deputies interviewed guests from the party at the Shack and learned that the two brothers had briefly attended on the night in question. Two of these guests testified that Clint and Darnell Baldwin arrived at the party in Darnell's 1975 Monte Carlo between 2:00 and 2:30 in the morning and stayed approximately fifteen to thirty minutes. The Baldwins spoke with Bryan Dill during this visit. Darnell returned to the Shack around 4:30 a.m. and stayed for a few minutes but never got out of his car.

¶7. Continuing to seek interviews with persons who attended the party at the Shack, deputies went to Darnell's home on April 9 to talk with him about the night of Liz's disappearance. The deputies noted that during the interview Darnell was visibly upset-his hands shaking as he chain-smoked, his voice trembling as he spoke. He repeatedly refused their invitations to come to the Sheriff's Department for an interview, as well as, their request to examine the inside of the Monte Carlo. Believing Darnell's actions to be suspicious, the deputies left the house to arrange surveillance of the vehicle. Upon their return, the Monte Carlo was gone. It was found over four months later near the state line in Alabama. The car had been completely destroyed-burned from the hood to the trunk.

¶8. Dr. Steven Hayne, a pathologist with the Department of Public Safety and Medical Examiner's Office, performed an autopsy on Liz Dill's body. Dr. Hayne concluded that Liz died from a gunshot in the back of the head with a high-velocity bullet from a rifle. Liz's fingers, hands, and arms showed signs of defensive posturing, indicating that she had attempted to protect herself from blows to her face, neck, and chest prior to her death. Liz's skin was removed over most of her face, neck, and chest area, from below the left breast, which was completely removed. Dr. Hayne testified that this "skinning" was performed with a sharp object following Liz's death.

¶9. Dr. Hayne collected seminal fluid from Liz's vagina. The seminal fluid and a blood sample drawn from Darnell Baldwin were sent to a New Orleans laboratory known as GenTest (now called Reliagene Technologies) for DNA testing. At trial, Anne Montgomery, Reliagene's forensic laboratory director, was qualified as an expert in molecular biology and DNA analysis. She testified that the DNA profile from the seminal fluid matched the DNA profile from Darnell's blood sample.

¶10. In July, 1996, deputies took a statement from Clint Baldwin's lifelong friend Stanley Abrams. The statement was made after Abrams was arrested, along with Clint Baldwin, for intimidating a witness. (At trial Abrams recanted the statement, testifying that the detectives had written it and made him sign it, but did not allow him to read what he had signed.) The statement described a meeting between Abrams and Clint Baldwin in June, 1996. At that meeting Clint admitted to Abrams his involvement in the murder of Liz Dill and related the events surrounding it. According to Abrams' statement, Clint and Darnell met Bryan Dill at the camp house where he told them that Liz was at home by herself and instructed them to go "take care of business." The two followed Bryan's instructions and went to the house. Clint knocked on the door; Liz answered; Clint pushed his way in; and Liz fell. Darnell then grabbed her and put a rag in her mouth while Clint took a gun and a machete from the bedroom. Clint drove the car to a gravel pit while Darnell held Liz in the back seat. At the gravel pit Clint watched Darnell rape Liz. They pulled her from the car, knocked her out, and returned to the camp house. Bryan told them to return to the gravel pit and kill her. According to the statement, the brothers drove back to the gravel pit; Darnell cut Liz's throat with the machete; they wrapped her body, put it in the trunk of the Monte Carlo, and dropped it in a hog pen on a gravel road off

U. S. Highway 82.

¶11. The statement also revealed that Clint had taken Abrams to see the gravel pit where Liz Dill was murdered. Shortly after giving the statement, Abrams directed the deputies to the gravel pit. While there, the deputies discovered a pair of black shorts, a .270 caliber rifle shell casing, and some clear plastic sheeting resembling some they had previously seen at Darnell Baldwin's home.

¶12. In September, 1996, both Clint Baldwin and his brother, Darnell Baldwin, were arrested for the capital murder of Liz Dill. Darnell was found guilty and sentenced to life imprisonment without the possibility of parole. That conviction was affirmed by this Court. *See **Baldwin v. State***, 757 So. 2d 227 (Miss. 2000).

¶13. While awaiting trial, Clint was incarcerated with an inmate named Michael Ball. Ball testified that Clint had discussed Liz Dill's murder with him. According to Ball's report of Clint's admissions, Clint and his brother Darnell were hired for $5,000 to dispose of a body. When they arrived to get the body, however, the woman was alive. They killed her, placed her body in the trunk of Darnell's car, carried the body to a deserted area in the county, and disposed of it.

¶14. Clint was tried and convicted of capital murder before a jury chosen in Jackson County pursuant to a motion for change of venue. He was sentenced to a term of life imprisonment. He now appeals to this Court.

## ANALYSIS

### I. WHETHER BALDWIN WAS DENIED HIS RIGHT TO A FAIR AND IMPARTIAL JURY BECAUSE VENUE WAS CHANGED TO A COUNTY WITH A LOWER PERCENTAGE OF BLACK CITIZENS.

¶15. Baldwin contends that the trial court erred in failing to quash the venire on change of venue since Jackson County, where the jury was chosen, has a lower percentage of black citizens (22.3% potential black jurors) than Lowndes County (36-38% potential black jurors), where the crime occurred. He asserts that, in essence, he was forced to choose between his right to an impartial jury and his right to a jury of his peers.

¶16. This issue is controlled by our holding in **Simon v. State**, 688 So. 2d 791 (Miss. 1997). There we held that a defendant has no right to a change of venue to a county with a percentage of black citizens similar to that of the county where the offense occurred. *Id.* at 804. Prior to his first trial, Simon was granted a change of venue from Quitman County (where 53.6% of the registered voters were black) to Jones County (where 21% of the registered voters were black). *Id.* at 803. Prior to his second trial, Simon moved for a change of venue from Jones County. The motion was granted, and the case was moved to DeSoto County (where blacks comprised 15.2% of the population). As part of his appeal in *Simon v. State*, 633 So. 2d 407 (Miss. 1993), *vacated on other grounds*, *Simon v. Mississippi*, 513 U.S. 956, 115 S. Ct. 413, 130 L. Ed. 2d 329 (1994) (hereinafter referred to as *Simon I*), Simon cited as error the trial court's decision to move the case to a county with fewer black citizens than the original forum.

¶17. We held:

Although the defendant does have a right to be tried by a jury whose members were selected pursuant

to a nondiscriminatory criteria, the *Batson* court noted that the Sixth Amendment to the Constitution of the United States has never been held to require that petit juries actually chosen must mirror the community and reflect the various distinctive groups in the populations.

*Simon I*, 633 So. 2d at 412 (quoting *Britt v. State*, 520 So. 2d 1377, 1379 (Miss. 1988)). In *Simon II*, quoting Chief Justice Hawkins' language from *Simon I*, we found:

> Simon cites no cases to support his contention he was entitled to a second change of venue to a county with a population similar to Quitman County. Indeed the United States Supreme Court declined to make such a requirement incumbent on the states in the case of *Mallett v. Missouri*, 769 S.W.2d 77 (Mo. 1989), *cert. denied*, 494 U.S. 1009, 110 S. Ct. 1308, 108 L. Ed. 2d 484 (1990).

*Simon II*, 688 So. 2d at 803-04. Baldwin likewise fails to cite any case standing for the proposition that he was entitled to a change of venue to a county comprised of a percentage of black citizens similar to that of Lowndes County.

¶18. Baldwin has also failed to show that the trial court abused its discretion in its ruling on this issue. We have "repeatedly held that the matter of whether venue should be changed in a criminal proceeding is committed to the sound discretion of the trial judge." *Id.* at 804. Therefore, this issue is without merit.

## II. WHETHER THE TRIAL COURT COMMITTED REVERSIBLE ERROR WHEN IT DENIED BALDWIN'S OBJECTION TO THE STATE'S PEREMPTORY STRIKES OF BLACK JURORS.

¶19. Baldwin asserts that the State used its peremptory challenges in an unconstitutional manner by excluding potential black jurors from the jury. *See Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986). The State used eight of its twelve peremptory strikes to exclude black jurors but contends that it offered race-neutral reasons for each of those uses.

¶20. In order to establish a prima facie case of racial discrimination in the exercise of peremptory challenges, a defendant must show that:

> [H]e is a member of a cognizable racial group, and that the prosecutor has exercised peremptory challenges to remove the venire members of the defendant's race. Second, the defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits "those to discriminate who are of a mind to discriminate." *Avery v. Georgia*, 345 U.S. 559, 562, 73 S. Ct. 891, 892, 97 L. Ed. 1244 (1953). Finally, the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude veniremen from the petit jury on account of their race.

*Batson*, 476 U.S. at 96, 106 S. Ct. at 1722-23, 90 L. Ed. 2d at 87. This Court has further provided that:

> Under *Batson*, the party objecting to the peremptory challenge must first make a prima facie showing that race was the criteria for the exercise of the peremptory strike. The burden then shifts to the party exercising the challenge to offer a race-neutral explanation for striking the potential juror. Finally, the trial court must determine whether the objecting party has met its burden to prove that there has been purposeful discrimination in the exercise of the peremptory.

*McFarland v. State*, 707 So. 2d 166, 171 (Miss. 1997) (citations omitted).

¶21. In *Kolberg v. State*, 704 So. 2d 1307, 1312 (Miss. 1997), we held:

> Realizing the importance of credibility and first-hand observation, this Court has adopted a standard of review for *Batson* claims that accords "great deference" to a trial judge's factual findings, reversing only where the finding of the lower court was clearly erroneous or against the overwhelming weight of the evidence.

*Id.* (citing *Lockett v. State*, 517 So. 2d 1346, 1350 (Miss. 1987)). "'Great deference' has been defined in the *Batson* context as insulating from appellate reversal any trial findings which are not clearly erroneous." *Lockett v. State*, 517 So. 2d at 1349-50 (citing *United States v. Mathews*, 803 F.2d 325 (7th Cir. 1986)). This deference specifically includes a trial judge's determination of any racially discriminatory motive underlying any articulated reasons given. *Harper v. State*, 635 So. 2d 864, 868 (Miss. 1994).

¶22. The State used a peremptory challenge against a black social worker and cited as a race-neutral reason, in addition to her profession, her body language and demeanor when informed that the case was a capital murder prosecution. The State struck a potential black male juror for his "bad name" and because he lived in what was known to be a "bad neighborhood." Local law enforcement had informed the prosecution that many persons with this man's surname had been prosecuted in Jackson County. Another potential juror struck for living in a "bad neighborhood" was also uncertain regarding his ability to vote for the death penalty. The State used a peremptory challenge against a black woman who had first vehemently expressed her stance against the death penalty and later took the opposite view. This woman's brother had been convicted of aggravated assault and robbery, and she had been arrested for DUI. Further, she lived in a high crime area. A black man was struck for his position against the death penalty and for his DUI conviction. Another woman was struck for her body language and for the fact that a relative had been convicted of a crime. The State exercised a peremptory challenge against a black mental health hospital attendant whose opinion regarding the death penalty changed some time between his initial questionnaire and voir dire. He had also been arrested for an expired driver's license. Finally, the State struck a black man who had recently been arrested for an open container violation. The State also expressed concern about his truthfulness due to discrepancies between his questionnaire and voir dire.

¶23. Offering guidance to the trial courts of this state, this Court in *Lockett*, 517 So. 2d at 1356-57, approved a list of race-neutral reasons accepted by other jurisdictions. Among these are the following: living in a "high crime" area, body language, demeanor, prosecutor's distrust of the juror, inconsistency between oral responses and juror's card, criminal history of juror or relative (including DUI), social work and other types of employment, and religious beliefs. *Id.* Each of the reasons offered by the State in the case sub judice may be found in the *Lockett* list. Furthermore, we were careful to point out that our list in *Lockett* is not exhaustive. *Id.* at 1352.

¶24. The defense, the prosecution, and the trial court each followed the proper procedure pursuant to *Batson*: the defense making its prima facie showing, the prosecution offering race-neutral explanations in response, and the trial court making its ruling. The trial court did not err in finding the State's reasons facially race neutral. Therefore, we find this assignment of error to be without merit.

### III. WHETHER THE TRIAL COURT ERRED IN ADMITTING THE EXPERT OPINION THAT THE SPERM FOUND IN THE VICTIM'S VAGINA CONTAINED DNA

**IDENTIFIED AS THAT OF THE DEFENDANT'S BROTHER DARNELL BALDWIN.**

¶25. At trial, Anne Montgomery, the State's DNA analysis expert, testified that the DNA profile from the seminal fluid found in the victim's vagina matched the DNA profile from Darnell Baldwin's blood sample. Clint Baldwin asserts that this evidence was more prejudicial than probative and that the trial court erred in allowing it to be admitted. The State asserts that the evidence is relevant to prove its theory of the case. The theory is that Clint and Darnell Baldwin kidnapped Liz Dill, Darnell raped her, and the brothers then shot and killed her.

¶26. Rule 401 of the Mississippi Rules of Evidence defines "relevant evidence" as evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence. Miss. R. Evid. 403.

¶27. We stated in *Foster v. State*, 508 So. 2d 1111, 1117-18 (Miss. 1987), that even when the trial court determines under Rule 403 that prejudice substantially outweighs the probative value of particular evidence, it remains within the court's discretion to determine whether to exclude the evidence, since Rule 403 does not mandate such an exclusion but rather states that the evidence *may* be excluded. We then stated that our task as an appellate court reviewing a Rule 403 determination is not to engage anew in the Rule 403 balancing process. *Id.* Rather, this Court must simply determine whether the trial court abused its discretion in weighing the factors and admitting or excluding the evidence. *Id.*

¶28. The evidence that Darnell's seminal fluid was found in the victim's vagina is relevant as it makes the State's theory of the case more probable than it would be without the evidence. The evidence is consistent with the testimony of others regarding Clint's admissions that Darnell raped Liz Dill while Clint watched. The rape was part of the sequence of events leading to Liz Dill's murder; thus, evidence linking Clint's brother to the rape is clearly relevant. We find that the trial court did not abuse its discretion and that this issue is without merit.

### IV. WHETHER THE TRIAL COURT ERRED WHEN IT ADMITTED EVIDENCE THAT STANLEY ABRAMS WAS ARRESTED FOR INTIMIDATING A WITNESS.

¶29. Baldwin contends that the trial court erred in allowing the State to introduce evidence that Stanley Abrams had been arrested for intimidating a witness. While he recognizes that evidence of other bad acts, including arrests, may be admitted if such evidence goes to the veracity of the witness, Baldwin asserts that Abrams' arrest did not go to Abrams' veracity but rather to his "bad character" and is, thus, inadmissible. Rather than address the evidentiary rules regarding the admission of character evidence, the State simply points out Baldwin's mistake about what the trial court allowed the State to introduce. The record reveals that the State is correct.

¶30. The following exchange occurred during the State's cross-examination of Abrams regarding his statement made to investigators:

> Q: The occasion of you giving this statement was when you had been arrested for intimidating a witness. Is that correct?

A: Yes, sir.

Q: And that was an incident that you were charged with along with Clint Baldwin. Is that correct?

Defense counsel: I object to that, your Honor.

The court: The objection is sus-

Defense counsel: May I approach the bench?

The court: The objection is sustained.

Defense counsel: May we approach the bench, your Honor?

The court: The objection is sustained. The jury will disregard that remark.

Defense counsel: May we approach the bench, your Honor?

The court: Any more curative efforts you would like the court to have, Mr. Farrow [defense counsel]?

At this point the defense moved for a mistrial which was denied. After a bench discussion among the attorneys and the trial judge, the court admonished the jury regarding the improper testimony of Abrams.

The court: Ladies and gentlemen, I sustained an objection a moment ago and told you to disregard that last testimony. That same ruling and same instruction applies.

¶31. "It is presumed that the jury follows the instructions of the trial court." *Hobson v. State*, 730 So. 2d 20, 25 (Miss. 1998) (citing *Johnson v. State*, 475 So. 2d 1136, 1142 (Miss. 1985)). We have repeatedly held that where the trial court sustains an objection to the inadmissible testimony of a witness and instructs the jury to disregard same, prejudicial error does not result from that improper testimony. *Snelson v. State*, 704 So. 2d 452, 456 (Miss. 1997). "[W]here an objection to such impermissible testimony is sustained and the jury is admonished by the trial court to disregard the statement, this Court has repeatedly held that refusal to grant a mistrial is proper." *Crosswhite v. State*, 732 So. 2d 856, 861 (Miss. 1998) (quoting *McNeal v. State*, 658 So. 2d 1345, 1348 (Miss. 1995)).

¶32. Contrary to Baldwin's contention, the trial court did not allow the State to introduce evidence that Stanley Abrams had been arrested for intimidating a witness. Rather, the trial judge sustained Baldwin's objection, heard his motion for a mistrial, overruled that motion, and then twice admonished the jury to disregard the impermissible testimony. The court's curative efforts prevented the occurrence of prejudicial error. This assignment of error is without merit.

### V. WHETHER THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY ADMITTING PHOTOGRAPHS OF LIZ DILL'S BODY.

¶33. The State admitted five photographs of Liz Dill's body over defense objections that the photographs were more prejudicial than probative. The trial court found the photographs to be somewhat gruesome but admitted them since they showed the extent of the wounds inflicted upon Liz Dill. Claiming that the photographs lacked evidentiary value and were inflammatory, Baldwin asserts that the trial court erred in allowing them to be admitted. The State contends that the photographs proved the location and condition of

Liz Dill's body as well as the location and nature of her wounds.

¶34. The admissibility of photographs generally lies within the sound discretion of the trial court; and, absent an abuse of discretion, the court's decision will be upheld on appeal. *Taylor v. State*, 672 So. 2d 1246, 1270 (Miss. 1996). As to probative value versus prejudice, we held in *Foster v. State*, 508 So. 2d at 1117-18, that because of the discretion vested in the trial court, the task of an appellate court reviewing a Rule 403 ruling is not to re-engage in the Rule 403 balancing process. Rather, the task is simply to determine whether the trial court abused its discretion in weighing the factors and admitting or excluding the evidence. *Id.*

¶35. According to our holding in *Westbrook v. State*, 658 So. 2d 847, 849 (Miss. 1995), photographs have evidentiary value where they aid in describing the circumstances of the killing and the corpus delicti, where they describe the location of the body and cause of death, and where they supplement or clarify witness testimony. Photographs of bodies are admissible where they are not so gruesome as to be overly prejudicial and inflammatory. *Taylor*, 672 So. 2d at 1270 (quoting *Stringer v. State*, 500 So. 2d 928, 934 (Miss.1986)). Only once has this Court found photographs to be so gruesome and inflammatory as to be inadmissible: a close-up photograph of a partly decomposed, maggot-infested skull. *See McNeal v. State*, 551 So. 2d 151 (Miss. 1989). The photographs in the present case do not rise to the level of inflammatory gruesomeness as those found in *McNeal*.

¶36. The photographs show the location of the body and the position and nature of the wounds. Such reasons for admission have previously satisfied this Court . *See, e.g.*, *Jackson v. State*, 684 So. 2d 1213, 1231 (Miss. 1996); *Westbrook*, 658 So. 2d at 849. Further, the photographs supplement and clarify witness testimony. *Id.* Jody Creel Newell, a forensic scientist who investigated the crime scene and examined Liz Dill's body, testified that when found, Liz Dill's body was lying on its back. The body was completely nude. The legs were spread shoulder width apart; the arms were above the head; the elbows were slightly bent; and the hands were slightly clinched. The face was missing, and the skin had been removed from the upper chest beneath the left breast, which was also missing. There was possible insect activity on the stomach and legs, and there were clumps of hair on the back of the skull and above the head. Bruises were found on the legs and ankles. The photographs support Newell's testimony.

¶37. The trial court allowed only eight of approximately one hundred photographs taken to be admitted. The trial court did not abuse its discretion in determining that the probative value of these photographs outweighed the prejudicial effect. Therefore, we find this assignment of error to be without merit.

### VI. WHETHER THE TRIAL COURT ERRED IN ADMITTING THE HEARSAY TESTIMONY OF BRYAN DILL.

¶38. Baldwin asserts that the trial court erred by admitting over objection the inadmissible hearsay of Bryan Dill. Detective Tony Mulligan of the Lowndes County Sheriff's Department testified that Bryan told him he only had approximately $12,000 to $25,000 in life insurance on his wife. The detective also testified as follows:

Q: And what did you respond to him insofar as this, uh, information about insurance was concerned?

A: I told him, I said, uh, "Well, Bryan, uh, you can't collect insurance on her until her body is, uh, found anyway."

Q: That was on April 8, 1996, is that correct?

A: That's correct, around lunch time.

Q: And when was the body of Liz Dill found?

A: Uh, April ninth at approximately two p.m.

Q: Subsequently to that, how much life insurance did you discover Bryan Dill actually had on his wife?

A: We've, uh, found he had over two hundred and fifty thousand dollars is what he would collect.

Baldwin did not object to the introduction of this second amount. His only objection concerned Bryan Dill's statement to Mulligan regarding the "$12,000 to $25,000" amount.

¶39. The State argues that Bryan Dill's statement about the amount of life insurance was not offered to prove the truth of the matter asserted but rather to show that Bryan Dill misled the detective. The State theorizes that Dill hired and paid Clint and Darnell Baldwin to kill his wife. According to the State's theory, Dill's motive was to collect a large amount of life insurance. The State asserts that the testimony in question was offered to prove the fact that Bryan Dill lied to the detective in an effort to hide his motive to have his wife killed.

¶40. Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Miss. R. Evid. 801(c). A statement that is not offered to prove the truth of the matter asserted is not hearsay and is, thus, admissible if it meets other evidentiary requirements. *See generally* **Jones v. State**, 776 So.2d 643, 649-50 (Miss. 2000) (holding that testimony of capital murder victim's mother that co-defendant told her the victim would be killed if she did not give money owed was not offered to prove the truth of the matter asserted and was, thus, not hearsay).

¶41. In the present case, the State attempted to establish its theory by presenting Bryan Dill's motive through the testimony of Detective Mulligan. Clearly, the State did not offer Mulligan's testimony to prove that Bryan Dill only had a $12,000 to $25,000 life insurance policy on his wife. The statements of Detective Mulligan do not fit the definition of hearsay and were admissible. Therefore, we find this assignment of error to be without merit.

### VII. WHETHER THE TRIAL COURT ERRED WHEN IT ADMITTED INTO EVIDENCE A RIFLE CASING AND A PAIR OF BLACK SHORTS.

¶42. The State offered into evidence over Baldwin's objection a pair of black shorts and a .270 caliber rifle shell casing found at the gravel pit where Stanley Abrams had taken detectives in July 1996. Baldwin asserts that the trial court erred in allowing the admission of this evidence because it was irrelevant, it was not sufficiently linked to him, and it was more prejudicial than probative. The State asserts that the evidence is consistent with the statement of Stanley Abrams and has probative value since it was discovered by detectives at the gravel pit to which Abrams had directed them. Further, the State points out that Dr. Steven Hayne, the medical examiner who performed Liz Dill's autopsy, testified that a .270 Winchester would be sufficient to cause the deadly gunshot wound in the back of Liz's head.

¶43. Relevant evidence is evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Miss. R. Evid. 401. Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence. Miss. R. Evid. 403. As discussed under Issues III and V above, the standard of review regarding Rule 403 determinations is an "abuse of discretion." *Foster v. State*, 508 So. 2d at 1117-18.

¶44. The shorts corroborate Clint Baldwin's admission as reported by Abrams. Clint had stated that Liz Dill was wearing shorts before Darnell raped her. When Abrams recanted his statement at trial, the jury was left to determine which story it would believe. "It is the sole province of the jury to resolve any conflicts arising from the testimony presented at trial." *White v. State*, 742 So. 2d 1126, 1131 (Miss. 1999).

¶45. The .270 caliber rifle shell casing corroborates the testimony of Dr. Hayne that Liz Dill was killed by a high-velocity gunshot to the back of her head. Detective Frank Baker testified that several shell casings were found in the gravel pit, but only one .270 casing was discovered. The State theorizes that if someone had been sighting a gun or target shooting, more than one casing would have been found. Again, these issues were for the jury to weigh and determine.

¶46. The shorts and the rifle shell casing tend to make more probable the State's theory that Clint and Darnell Baldwin took Liz Dill to the gravel pit, Darnell raped her, and they shot her in the head with a high-powered rifle. Thus, the evidence meets the definition of "relevant evidence" under Rule 401. Further, the probative value of the evidence is not outweighed by any of the factors listed in Rule 403. The trial court does not appear to have abused its discretion in allowing the evidence to be admitted. For these reasons, we find no merit to this assignment of error.

### VIII. WHETHER THE TRIAL COURT ERRED WHEN IT ADMITTED EVIDENCE THAT DETECTIVE FRANK BAKER FOUND CO-DEFENDANT DARNELL BALDWIN'S BURNED CAR IN AUGUST, 1996.

¶47. Baldwin asserts that the trial court erred by allowing State's witness Detective Frank Baker to testify that Darnell Baldwin's 1975 Monte Carlo was found burned across the state line in Alabama. Baldwin argues that the evidence was more prejudicial than probative. The State responds that the evidence is extremely probative as this automobile was used to transport Liz Dill.

¶48. The definition of relevant evidence, the balancing test of Rule 403, and the standard of review regarding this issue have been discussed in detail in Issues III, V, and VII above. Darnell's 1975 Monte Carlo appears time and again throughout this case. Though mute and inanimate, its repeated presence proved damning to the defense. Witnesses testified to its appearance at the Shack; deputies testified to Darnell's refusal to let them examine it; and Abrams testified to its use in the transport of Liz Dill, to the fact that Clint drove it while Darnell held Liz in the back seat, and to the car's history following Liz's rape and murder. The fact that in August, 1996, the Monte Carlo was found burned from hood to trunk across the state line in Alabama four to six miles from Darnell Baldwin's house could not be more relevant.

¶49. The only question remaining is whether this evidence was substantially more prejudicial than probative under Rule 403. "This rule is meant to keep out evidence in only the most extreme circumstances." *Hans Constr. Co. v. Drummond*, 653 So. 2d 253, 265 (Miss. 1995). Applying Rule 403 to the facts of the

case at bar, it is clear that the evidence pertaining to the Monte Carlo is not so unfairly prejudicial, confusing, or misleading as to force exclusion under the high standards of this rule. The trial court has not abused its discretion. Therefore, we find this assignment of error to be without merit.

### IX. WHETHER THE TRIAL COURT ERRED IN ALLOWING CINDY HOSLI TO TESTIFY THAT CLINT BALDWIN THREATENED AND INTIMIDATED HER BECAUSE HE THOUGHT SHE HAD TALKED TO THE POLICE ABOUT HIM.

¶50. Baldwin asserts that the trial court erred in allowing State's witness Cindy Hosli to testify that Baldwin, believing she had talked with the police about him, threatened and intimidated her. According to the State, the trial court correctly found that the threat had probative value because it showed guilty knowledge and that the probative value outweighed potential unfair prejudice.

¶51. The trial court first heard Cindy Hosli's testimony outside the presence of the jury. Hosli testified that during the last week of June or first week of July, 1996, she talked with Deputy Marc Miley regarding Liz Dill's murder. She further testified that shortly thereafter Clint Baldwin approached her and a co-worker at their workplace-a convenience store near Baldwin's home. Hosli offered a narrative of the events that followed:

> Q: When the store kind of cleared out, when some of the customers cleared out, what did Mr. Baldwin do?
>
> A: He approached the counter and leaned up on it like this and, uh, put his hands together kind of like over across the counter and said that, uh-he says, "Well, I thought y'all was my-my buddies," like that. And I looked at Clint and I said, "Well, what do you mean?" And he says, uh, "I hear y'all been talking to the cops," and I looked at him and I says, "I don't know where you're getting that from." I said, "But you need to go back and recheck your sources because we haven't said anything to them," and then at that time he walked around to the other part of the counter, and we had a little indention there where the flap lifted up. He walked over to Rita and, uh, he ran his fingers down the part of her hair and said that he could just as verily easily crack her skull, and went like that by the part of her head and snapped his finger, and wouldn't think twice about it, and it kind of shook us up.

Further testimony revealed that Hosli knew nothing about Liz Dill's murder and had been unable to offer any assistance to Deputy Miley at their meeting.

¶52. Baldwin moved to exclude Hosli's testimony on the ground that it was more prejudicial than probative. The trial court found the evidence of intimidation to be relevant since it revealed a consciousness of guilt. The court then weighed the probative value against the risk of unfair prejudice and decided to allow the testimony but sua sponte offered the defendant a limiting instruction. The jury returned, and the testimony was presented.

¶53. Once again the analysis turns to relevance. The Fifth Circuit's holding in *United States v. Bright*, 630 F.2d 804 (5th Cir. 1980), offers some guidance as to the relevance of evidence revealing the intimidation of witnesses. The defendants in *Bright* had been convicted of substantive violations of the Racketeer Influenced and Corrupt Organizations Act and other charges arising from the operation of the DeSoto County, Mississippi, Sheriff's Office. *Id.* at 808. In affirming the conviction, the Fifth Circuit found relevant and admissible the testimony of a honky-tonk operator who stated that one of the sheriff's deputies had

asked him to change his testimony before trial. *Id.* at 821. The prosecution's asserted purpose in introducing the evidence was to show a "consciousness of guilt" on the part of the deputy. *Id.* The Fifth Circuit agreed that it was admissible for that purpose. *Id.* (citing *United States v. Hoffa*, 349 F.2d 20, 45 (6th Cir. 1965), *aff'd*, 385 U.S. 293, 87 S. Ct. 408, 17 L. Ed. 2d 374 (1966)).

¶54. Following the Fifth Circuit's precedent, the trial court found Cindy Hosli's testimony relevant. The court further found that the probative value outweighed the prejudicial effect and allowed the testimony. We concur with the trial court's finding.

¶55. The evidence was not cumulative, misleading, or confusing. Further, it appears that the only time wasted was with the court's pondering over the admissibility of the evidence. The witness testified that she knew nothing about Liz Dill's murder, and the trial court offered the defendant a limiting instruction. Thus, there could have been little danger of unfair prejudice.

¶56. We find that the trial court did not abuse its discretion in performing the Rule 403 balancing and in admitting the testimony of Cindy Hosli. *See Foster v. State*, 508 So. 2d at 1117-18. Therefore, we find this assignment of error to be without merit.

### X. WHETHER THE TRIAL COURT ERRED IN ALLOWING THE STATE TO IMPEACH DEFENSE WITNESS TERRY DORA WITH HIS CONVICTION FOR THE SALE OF COCAINE.

¶57. Baldwin asserts that the trial court erred in allowing the State to introduce evidence that defense witness Terry Dora had been convicted for the sale of cocaine. Baldwin further argues that the trial court did not make an adequate finding on the record regarding the admissibility of this evidence. The State responds that the evidence was properly admitted to show Dora's bias and prejudice against the office of the district attorney who had prosecuted him for the sale of cocaine.

¶58. Terry Dora was Baldwin's cell-mate while Baldwin awaited trial. The defense called Dora to testify that Baldwin had never discussed the charges against him and to refute the testimony of another cell-mate, State's witness, Michael Ball. Ball had testified that Baldwin discussed Liz Dill's murder with him. Dora testified that he never saw Baldwin speak alone with Michael Ball.

¶59. Before cross-examining Dora, the assistant district attorney approached the bench to inform the judge of his intentions to impeach Dora with the conviction for the sale of cocaine. He explained that he was the prosecutor involved in Dora's conviction and that he wished to introduce the conviction to show bias and prejudice. The court allowed the testimony.

¶60. Rule 609 of the Mississippi Rules of Evidence provides as follows:

> For the purpose of attacking the credibility of a witness, evidence that he has been convicted of a crime shall be admitted if elicited from him or established by public record during cross-examination but only if the crime (1) was punishable by death or imprisonment in excess of one year under the law under which he was convicted, and the court determines that the probative value of admitting this evidence outweighs its prejudicial effect on a party or (2) involved dishonesty or false statement, regardless of the punishment.

This Court addressed Rule 609 in *Peterson v. State*, 518 So. 2d 632, 636 (Miss. 1987), and stated:

We hold today that Rule 609(a)(1) requires the trial judge to make an on-the-record determination that the probative value of the prior conviction outweighs its prejudicial effect before admitting any evidence of a prior conviction.

\* \* \*

What factors should the trial judge consider when weighing the probative value of the convictions against the prejudicial effect of their admission? Although the relevant considerations will vary according to the particular facts of each case, there are some general factors which should be considered when a trial judge is making this determination. In **Preston**, *supra*, the [Fifth Circuit] court listed the following: (1) the kind of crime involved; (2) when the conviction occurred; (3) importance of the witness' testimony to the case; (4) the importance of the credibility of the defendant. (Citation omitted).

A more specific list of factors to be considered by the trial judge was outlined in **Gordon v. United States**, 383 F.2d 936, 940 (D.C. Cir. 1967) (Burger, J.); and is set forth in Weinstein's *Evidence*:

(1) The impeachment value of the prior crime.

(2) The point in time of the conviction and the witness' subsequent history.

(3) The similarity between the past crime and the charged crime.

(4) The importance of the defendant's testimony.

(5) The centrality of the credibility issue.

¶61. In **Johnson v. State**, 655 So. 2d 37, 41 (Miss. 1995), we stated, "[T]here are several ways to impeach a witness' credibility including the showing of bias or prejudice of the witness . . . as long as the impeaching material is relevant to the issue at hand." We have held that the scope of cross-examination, though ordinarily broad, is within the sound discretion of the trial court, and the trial court possesses inherent power to limit cross-examination to relevant matters. **_Smith v. State_**, 733 So. 2d 793, 801 (Miss. 1999).

¶62. Applying the guidelines established by this Court to the facts of the case at bar, we conclude that the trial court appropriately admitted the testimony of Terry Dora regarding his conviction for the sale of cocaine. Our holding in **Johnson** clearly allows such evidence showing bias or prejudice of the witness. Baldwin argues, however, that the trial court committed reversible error by failing to make an adequate finding on the record pursuant to **Peterson**. While the judge may have failed to enunciate succinctly the **Peterson** criteria, it is nonetheless clear that the court's decision was based on a thorough contemplation of the intended testimony, the arguments both for and against the testimony, and the judge's knowledge of the applicable evidentiary rules. If the court erred by not enunciating **Peterson** findings, the error was harmless, especially in light of our holdings in **Johnson** and **_Smith_**. Further, it should be noted that during Dora's direct examination Baldwin elicited testimony that the two of them had been incarcerated together in the Lowndes County jail. Obviously, Dora had been prosecuted for some crime, or he would not have been in jail with Baldwin. Baldwin should not be allowed to claim unfair prejudicial effect as he was the first to present the subject of Dora's criminal history. We find that the trial court did not abuse its discretion in allowing the State to admit the testimony of Dora's prior conviction. Therefore, we find this assignment of

error to be without merit.

### XI. WHETHER THE TRIAL COURT ERRED IN ALLOWING THE STATE IN CLOSING ARGUMENT TO COMMENT THAT THE ONLY TWO PEOPLE WHO COULD TESTIFY AGAINST BRYAN DILL BOTH REFUSED TO INCRIMINATE HIM.

¶63. Baldwin asserts that during closing argument the State inappropriately commented on his failure to testify. The State argues that the comment in question did not regard Clint Baldwin's failure to testify. A review of the record reveals that the State is correct.

¶64. During Baldwin's closing argument, counsel argued that "Bryan Dill isn't up here on trial for his life. Bryan Dill is out there walking free." The State responded to this issue in its closing by stating:

> Yes, Bryan Dill is not up here. He's not here, ladies and gentlemen, because there's nobody that can testify, "I heard Bryan Dill admit to hiring these people to kill this woman." Nobody can say that. There's nobody that can say they saw the money change hands. There's nobody that can say they saw him do any act toward the commission. . . . There's not a case until somebody can testify, and the two people who can testify, ladies and gentlemen, have pled not guilty.

¶65. We have held that the trial court is in the best position to weigh the consequences of an objectionable argument and, unless serious and irreparable damage has occurred, at that point admonish the jury to disregard the improper comment. *McGilberry v. State*, 741 So. 2d 894, 909 (Miss. 1999). Whether there is error based on improper prosecutorial comments must be determined according to the facts of the particular case. *Ladner v. State*, 584 So. 2d 743, 754 (Miss. 1991). "This Court has made it clear that direct comment on a defendant's failure to testify is constitutionally impermissible and constitutes error." *Id.* The prosecutor is also prohibited from referring by innuendo and insinuation to the defendant's failure to testify. *Id.* (citing *Jimpson v. State*, 532 So. 2d 985, 991 (Miss.1988)).

¶66. The prosecutor in the case sub judice made neither a direct comment nor reference through innuendo and insinuation to Clint Baldwin's failure to testify. He merely responded to Baldwin's argument that Bryan Dill was walking free. The trial court found that he did so in a proper manner. We agree and find this assignment of error to be without merit.

### XII. WHETHER THE VERDICT IS AGAINST THE OVERWHELMING WEIGHT OF THE EVIDENCE.

¶67. Baldwin asserts that the verdict is against the overwhelming weight of the evidence. He claims that the jury was inflamed by the photographs of Liz Dill's body and by the evidence against Darnell Baldwin and Bryan Dill. Baldwin asserts that no physical evidence was ever recovered implicating him. Further, he contends that he has an alibi for the evening in question.

¶68. "In determining whether a jury verdict is against the overwhelming weight of the evidence, this Court must accept as true the evidence which supports the verdict and will reverse only when convinced that the trial court has abused its discretion in failing to grant a new trial." *Lewis v. State*, 765 So. 2d 493, 497 (Miss. 2000) (quoting *Herring v. State*, 691 So. 2d 948, 957 (Miss.1997)). "Only in those cases where the verdict is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice will this Court disturb it on appeal." *Id.* When reasonable jurors could

have found the defendant guilty based on the evidence before them, the verdict is beyond our authority to disturb. *Taylor v. State*, 672 So. 2d at 1255. "The prosecution must be given the benefit of all favorable inferences that may be reasonably drawn from the evidence." *McClain v. State*, 625 So. 2d 774, 778 (Miss. 1993) (citing *Wetz v. State*, 503 So. 2d 803, 808 (Miss. 1987)). "Matters regarding the weight and credibility of the evidence are to be resolved by the jury." *McClain*, 625 So. 2d at 778 (citing *Neal v. State*, 451 So. 2d 743, 758 (Miss.1984)).

¶69. Baldwin's assertions regarding the admission of the photographs of Liz Dill's body as well as his contentions regarding the evidence against Darnell Baldwin and Bryan Dill have been addressed under various assignments of error above. His argument regarding the lack of "physical evidence" linking him to the crime is without merit. We have upheld numerous convictions where no physical evidence was discovered or presented at trial. In *Carter v. State*, 743 So. 2d 985 (Miss. 1999), we affirmed a capital murder conviction although no physical evidence linked the defendant to the crime. We held that the testimony of eyewitnesses was sufficient to support the jury's verdict despite the fact that one of the eyewitnesses was drunk at the time of the crime and had been using cocaine the whole day and the other was a heavy marijuana user who was only fifteen years old when she allegedly witnessed the shooting. *Id.* at 986. Although remanding for a *Batson* hearing, this Court in *Walker v. State*, 740 So. 2d 873, 879 (Miss. 1999), found that the defendant's confession to a cell-mate that he had killed the victim was sufficient to support a capital murder conviction and death sentence even though no physical evidence connecting the defendant to the crime was discovered.

¶70. Finally, Baldwin's so-called "alibi" proves to be of no help to him. While certain witnesses did testify to Baldwin's whereabouts on the night in question, no one was able to account for him between approximately 12:45 a.m. and 5:00 a.m. All testimony presented in furtherance of the State's theory indicates that the murder occurred at some point within that time frame.

¶71. Sufficient evidence to support the jury's verdict is found throughout the record. Detective Tony Mulligan testified that Bryan Dill lied about Liz's life insurance. Stanley Abrams signed a statement detailing Clint Baldwin's admissions regarding the kidnap, rape, and murder of Liz Dill. Investigator Frank Baker testified that Stanley Abrams directed him to the gravel pit where Liz was murdered. There he discovered clear plastic sheeting like that seen at Darnell Baldwin's house, a pair of shorts, and a .270 caliber rifle shell casing. Abrams had testified that Liz was wearing shorts when she was kidnapped by the Baldwin brothers. Dr. Steven Hayne testified that a .270 Winchester would have been sufficient to cause the deadly gunshot wound to the back of Liz's head. Michael Ball testified that while he was in jail with Baldwin, Baldwin told him that he was hired for $5,000 to dispose of a body. According to his admission to Ball, when Clint and his brother Darnell arrived to get the body, the woman was alive. They killed her and dumped her body in a deserted area in the county. Darnell Baldwin's 1975 Monte Carlo was found burned just over the state line in Alabama. Cindy Hosli testified that Clint Baldwin threatened her after she had spoken with Deputy Marc Miley. And again, Clint Baldwin does not have a sufficient alibi for the time period in question.

¶72. Reviewing the evidence in the light most favorable to the verdict, we do not find that the verdict was against the overwhelming weight of the evidence. While the credibility of some of the witnesses may be suspect and while a few discrepancies exist among the various testimony presented, the overwhelming weight of the evidence supports the jury's verdict in this case. Therefore, we find no merit to this assignment of error.

## CONCLUSION

¶73. Due to the lack of merit in the foregoing assignments of error, we affirm the conviction and life sentence of Clint Baldwin for the capital murder of Mary Elizabeth Mosley Dill.

¶74. **CONVICTION OF CAPITAL MURDER AND SENTENCE OF LIFE IMPRISONMENT IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED. SAID SENTENCE TO BE SERVED CONSECUTIVELY WITH ANY OTHER SENTENCE APPELLANT IS NOW SERVING.**

**PITTMAN, C.J., McRAE, P.J., SMITH, WALLER, COBB AND DIAZ, JJ., CONCUR. BANKS, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION. EASLEY, J., NOT PARTICIPATING.**

**BANKS, PRESIDING JUSTICE, DISSENTING:**

¶75. I am compelled to dissent because, in my view, the prosecutor impermissibly commented upon the failure of the defendant to testify.

¶76. We have been scrupulous in guarding the defendant's constitutional right to remain silent. *See, e.g., Griffin v. State,* 557 So. 2d 542, 552 (Miss. 1990); *Jimpson v. State,* 532 So. 2d 985, 991 (Miss. 1988); *Livingston v. State,* 525 So. 2d 1300, 1305-08 (Miss. 1988); *Wilson v. State,* 433 So. 2d 1142, 1146 (Miss. 1983); *Yarbrough v. State,* 70 Miss. 593, 12 So. 551 (1893). The prosecutor's suggestion that the Baldwins, including this defendant, could have testified that Dill hired them to kill his wife, presupposes the defendant's guilt and blames his silence and entry of a plea of not guilty for the State's failure to prosecute Dill. In my view, based upon our longstanding precedents, this is reversible error. Accordingly, I would reverse and remand for a new trial.