# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2022-KA-00719-COA

**ERNEST EDWARDS A/K/A ERNEST JAMES EDWARDS**                    **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**                                                                 **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 06/17/2022 |
| TRIAL JUDGE: | HON. ANDREW K. HOWORTH |
| COURT FROM WHICH APPEALED: | LAFAYETTE COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: GEORGE T. HOLMES |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: LAUREN GABRIELLE CANTRELL |
| DISTRICT ATTORNEY: | KASSIE ANN COLEMAN |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 01/23/2024 |
| MOTION FOR REHEARING FILED: | |

**BEFORE WILSON, P.J., McDONALD AND LAWRENCE, JJ.**

**WILSON, P.J., FOR THE COURT:**

¶1.     Following a jury trial, Ernest Edwards was convicted of the attempted capital murder of Chancery Court Judge Charles Smith. During the trial, the court overruled Edwards's objections to testimony from two law enforcement officers regarding information they had received during the course of their investigation. Edwards argues that the testimony was hearsay and violated his right to confront the witnesses against him. However, the testimony was offered to explain law enforcement's next steps in the investigation, not to prove the truth of the matter asserted. Therefore, the statements were not hearsay, the officers'

testimony did not violate Edwards's right of confrontation, and the trial court did not abuse its discretion by overruling Edwards's objections. We find no reversible error and affirm.

## FACTS AND PROCEDURAL HISTORY

¶2. On March 16, 2020, around 7:15 a.m., Judge Charles Smith parked in his assigned space outside the Lauderdale County Courthouse, exited his truck, and walked toward the building. Suddenly, Judge Smith was shot in the hip. Judge Smith "nearly bled to death," but first responders quickly rendered aid to him, likely saving his life. The surgeon who performed emergency surgery on Judge Smith testified that bullet fragments being spread over a large area of his pelvis and the entry and exit wounds were consistent with him having been shot by a high-powered rifle.

¶3. There were no eyewitnesses to the shooting, and the only physical evidence recovered was the single .30-06 projectile that had wounded Judge Smith. Testing later confirmed the presence of Judge Smith's DNA on the projectile.

¶4. Mississippi Bureau of Investigation (MBI) Agent Bradley Edmondson testified that he suspected that the shot had been fired from a nearby abandoned building based on the direction from which Judge Smith appeared to have been shot. In a broken-out window of the building, Edmondson found bricks stacked in a way that "look[ed] like something that you would do to steady a rifle." The window provided an "unobstructed view" of the place where Judge Smith was shot approximately 130 to 140 yards away.

¶5. Edmondson also learned that on the morning of the shooting, "postal workers" had complained that a gold or tan car was blocking the entrance to the lot where their mail trucks

2

were parked. Edmondson learned that the postal workers first saw the car around 3:30 a.m. and saw it again around 6:00 a.m. when they returned to the post office. This was significant to Edmondson because the location was "right next to the abandoned building."

¶6. With no clear leads, law enforcement reviewed Judge Smith's court docket for potential suspects or leads. They identified and interviewed a number of persons of interest but uncovered no new leads, and the case became "cold."

¶7. In January 2021, Edmondson learned that Anthony Evans, an inmate in the Lauderdale County jail, claimed that he had information about Judge Smith's shooting. Evans was in jail due to multiple felony charges and a probation hold. Edmondson was unavailable at the time, so another MBI agent and Major Charles Pickett of the Lauderdale County Sheriff's Department interviewed Evans. Edmondson and Pickett later interviewed Evans's girlfriend, Tanika Dukes, as well. Evans and Dukes both testified at trial, and Edmondson and Pickett also testified about their interviews.[1]

¶8. According to Evans and Dukes, a few weeks prior to the shooting, they were on their way to see Evans's probation officer when they saw Edwards parked in a brown Honda Civic next to the abandoned building near the courthouse. Evans had gone to school with Edwards, and he thought Edwards appeared to be "plotting" when he saw him that day.[2] After Evans

---

[1] At trial, Evans acknowledged that he had offered to provide information about the shooting in exchange for his release from jail and because he hoped it would help with his pending charges. Evans was released from jail as a result of the information he provided, and at the time of Edwards's trial, the charges against Evans remained pending and unresolved.

[2] When asked whether he had "any . . . reason to believe that . . . Edwards . . . shot Judge Smith," Evans testified, "It was obvious. He was sitting, parked sitting there plotting,

and Dukes left the probation office, they were about to stop to talk to Edwards, but Edwards "waived at [them]" or "gave [them] the hand" as if to indicate that they should "keep going and not . . . stop." Edmondson and Pickett noted that Evans's and Dukes's description of Edwards's car matched the description of the car the postal workers had seen near the same abandoned building on the morning of Judge Smith's shooting.

¶9. After he witnessed Edwards "plotting," Evans was arrested for an unrelated offense, and he was in custody at the Lauderdale County jail on the day Judge Smith was shot. Evans and Dukes testified that sometime after Evans was released in March 2020, they met up with Edwards. They testified that while they were riding in a car with Edwards, Evans told Edwards, "I know you did it. I . . . think you shot that judge." According to Evans and Dukes, Edwards "just smiled" and did not deny the accusation.

¶10. Evans also told law enforcement and testified at trial that Edwards had complained about Edwards's former attorney, Charles Wright. Around 2009, Wright had represented Edwards on a charge of selling cocaine. Edwards pled guilty, and pursuant to a plea bargain that Wright negotiated, the court sentenced Edwards to serve eight years in prison consecutive to another sentence on an unrelated charge. Edwards was released from prison in December 2019, about three months before Judge Smith was shot. According to Evans, Edwards "felt like Charlie Wright didn't do him right."

¶11. By the time of Judge Smith's shooting, Wright had become a circuit judge and parked only two spaces away from Judge Smith at the Lauderdale County Courthouse. Edmondson

so it was obvious. Doesn't take no rocket scientist, I mean."

4

testified that from the window of the abandoned building 130 to 140 yards away, the shooter likely would not have been able to distinguish Judge Wright from Judge Smith.

¶12.    In sum, based on the information provided by Evans and Dukes, Edmondson believed that Edwards had studied the crime scene prior to the shooting, owned or had access to a car that matched the description of a car reportedly parked next to the abandoned building on the morning of the shooting, had a motive to kill Judge Wright, and had not denied that he shot Judge Smith.  Based on this information, Edmondson believed that Edwards intended to kill Judge Wright and shot Judge Smith by mistake.

¶13.    On February 12, 2021, Edwards was arrested, and his bond was revoked on an unrelated pending charge.  Law enforcement searched Edwards's car, which was parked about six blocks from the courthouse.[3]  In the trunk of the car, law enforcement found a box of .30-06 bullets, the same caliber as the bullet that nearly killed Judge Smith.

¶14.    On February 14, 2021, Edwards made a telephone call to his mother from the jail. Edwards had been living at his mother's house prior to his arrest.  During the call, which was recorded, Edwards asked his mother if an "issue" had been "taken care of."

¶15.    Law enforcement subsequently interviewed two of Edwards's brothers, Anthony and Willie.  Anthony testified before Edwards went to prison in 2009, Edwards gave him a .30-06 rifle with a scope to keep while Edwards was in prison.  Anthony testified that Edwards asked him for the rifle after he was released from prison in 2019, but the rifle had been "lost" while Edwards was in prison.  According to Anthony, Edwards became angry, took some of

---

[3] The car was titled to Edwards's sister, but Edwards regularly drove it.

Anthony's valuable belongings, and told Anthony he would not get his property back until Anthony replaced the missing rifle. Anthony could not buy a gun because he is a felon, so he asked his child's mother, April Wilson, to buy a rifle—a .30-06 rifle with a scope—for Edwards. Anthony located such a rifle at a pawnshop, Wilson bought it, and then Anthony gave it to Edwards. Records from the pawnshop confirmed that Wilson purchased a .30-06 Thompson/Center Compass rifle with a scope on December 31, 2019. Wilson also testified at trial and corroborated Anthony's testimony.[4]

¶16. Soon after Edwards was arrested for the attempted murder of Judge Smith, Anthony's sister called Anthony and summoned him to her house. When Anthony arrived at his sister's house, his sister and his mother told him to go to his mother's house and get rid of any guns or anything else illegal. They told Anthony to "be careful" and to "[m]ake sure [he was] not being watched." At his mother's house, Anthony found the .30-06 Thompson/Center Compass rifle in the closet of Edwards's room. Anthony took the gun to his brother Willie's house and asked Willie to "hold on to it." But Willie did not want to keep the gun because he is also a felon. Anthony told Willie that he would come back and get the gun later that night, but Anthony did not return for the gun.

¶17. When Anthony failed to return that night, Willie threw the rifle into Gallagher Creek near his house. On February 26, 2021, the sheriff's department brought Willie in for questioning. After Willie was promised that he would not be prosecuted for possessing a firearm as a felon, he told the deputies that Anthony had brought a rifle to his house. Willie

---

[4] Wilson acknowledged that she had been indicted for buying the rifle for a felon and that the charge against her would be dropped if she testified truthfully at trial.

then went with the deputies to Gallagher Creek and helped them retrieve the rifle. At trial, Willie identified the rifle as the same rifle Anthony brought to his house. Willie was indicted as an accessory after the fact to attempted capital murder, but he was promised that the charges would be dismissed if he testified truthfully at trial.

¶18. Anthony was also arrested and indicted as an accessory after the fact. Anthony later admitted to Major Pickett that Edwards's rifle needed to be moved because Edwards had shot someone with it. Anthony explained that prior to Edwards's arrest, he overheard Edwards tell their mother "I shot the MF judge." Anthony was told that if he cooperated and testified truthfully, the charge against him would be dismissed.

¶19. After the rifle was recovered, it was sent to the Mississippi Forensic Laboratory. Felicia McIntire, the Section Chief of Firearm and Tool Marks, testified that she restored the rifle's obliterated serial number, which matched the serial number of the rifle that Wilson had purchased for Anthony. After searching the "FBI general rifle and characteristic database," McIntire found only one other manufacturer that makes a .30-06 rifle with the specific rifling characteristic found on the bullet that struck Judge Smith. McIntire testified that she could not positively include or exclude the projectile that shot Judge Smith as having been fired from the rifle recovered from Gallagher Creek.

¶20. A Lauderdale County grand jury indicted Edwards for attempted capital murder. Due to extensive pretrial publicity, venue was transferred to Lafayette County. At trial, Edwards was the only defense witness. Edwards contradicted the testimony of Evans, Dukes, Willie, and Anthony in all material respects. Edwards also claimed that he moved to Gulfport in

January 2020 to live with his brother Michael and did not return to Meridian until May or June 2020. Edwards produced evidence showing that he cashed a check in Gulfport at 2:35 p.m. on March 20, 2020, four days after Judge Smith was shot. The jury found Edwards guilty of attempted capital murder, and the court sentenced him to life without eligibility for parole as a violent habitual offender. Edwards filed a motion for a new trial, which was denied, and a notice of appeal.

## ANALYSIS

¶21. On appeal, Edwards claims that the trial court erred by admitting hearsay in violation of his right to confrontation under the Confrontation Clause of the United States Constitution and the Confrontation Clause of the Mississippi Constitution.[5] U.S. Const. amend. VI; Miss. Const. art. III, § 26. Although Edwards raises only one "issue" on appeal, *see* M.R.A.P. 28(a)(3), his brief advances two distinct arguments. First, Edwards argues that Major Pickett improperly "bolstered" Evans's testimony by testifying about Evans's out-of-court statements to law enforcement. Second, Edwards argues that the trial court violated his right to confront the witnesses against him by allowing Pickett and Edmondson to testify regarding out-of-court statements made by "postal workers."

¶22. In general, we review a trial court's evidentiary rulings "for an abuse of discretion and will reverse if the admission of evidence results in prejudice to the accused." *Eubanks v. State*, 291 So. 3d 309, 322 (¶47) (Miss. 2020) (quoting *Rogers v. State*, 95 So. 3d 623, 627

---

[5] Edwards does not argue that the Mississippi Constitution requires a different analysis than the Sixth Amendment. *See Goforth v. State*, 70 So. 3d 174, 183 (¶42) (Miss. 2011) (stating in part that the two provisions "afford[] th[e] same right" and that "[f]ederal caselaw serves as our guide").

(¶13) (Miss. 2012)). "Unless we can safely say that the trial court abused its judicial discretion in allowing or disallowing evidence so as to prejudice . . . the accused in a criminal case, we will affirm the trial court's ruling." *Jones v. State*, 918 So. 2d 1220, 1223 (¶9) (Miss. 2005) (citing *McGowen v. State*, 859 So. 2d 320, 328 (¶27) (Miss. 2003)). We review Confrontation Clause objections de novo. *Goforth*, 70 So. 3d at 182 (¶36).

¶23. An out-of-court statement offered "to prove the truth of the matter asserted" is hearsay. MRE 801(c). Thus, to determine whether a statement is hearsay, we must first determine the purpose for which it was offered and admitted. *Smith v. State*, 258 So. 3d 292, 309 (¶50) (Miss. Ct. App. 2018). While "[p]rimarily, hearsay testimony obtained by an officer in conducting an investigation is inadmissible," *Jones v. State*, 303 So. 3d 734, 739 (¶19) (Miss. 2020) (quoting *Bridgeforth v. State*, 498 So. 2d 796, 800 (Miss. 1986)), "[a] statement is not hearsay if it is offered merely to show its effect on someone." *Swinney v. State*, 241 So. 3d 599, 610 (¶39) (Miss. 2018) (quoting *Gillett v. State*, 56 So. 3d 469, 504 (¶98) (Miss. 2010)). Indeed, "[o]ur Supreme Court and this Court have held repeatedly that out-of-court '[s]tatements do *not* constitute hearsay when admitted' not to prove the truth of the matter asserted but rather 'to explain an officer's course of investigation or motivation for the next investigatory step by that officer.'" *O'Quinn v. State*, 349 So. 3d 1226, 1231 (¶17) (Miss. Ct. App. 2022) (quoting *Eubanks*, 291 So. 3d at 322-23 (¶51)). As the Mississippi Supreme Court recently held, "[w]hen an officer's testimony is being used to explain why he did what he did in the course of his investigation, not to prove the truth of the matter asserted, then the testimony is not hearsay and is therefore admissible." *Dukes v.*

*State*, 369 So. 3d 553, 562-63 (¶35) (Miss. 2023).

¶24. At trial, Edwards objected to Major Pickett's testimony regarding Evans's statements to law enforcement. Edwards argued that such testimony was hearsay and improper bolstering. In response, the State argued that Evans had already been cross-examined and that the testimony was admissible for Pickett "to be able to discuss what steps he took next in his investigation." The trial court overruled Edwards's objection, ruling that the testimony was admissible "for the purpose of explaining [Pickett's] investigation."

¶25. Pickett's testimony regarding the information he obtained from Evans did indeed serve to explain "why he did what he did as he proceeded with his investigation." *Dukes*, 369 So. 3d at 563 (¶35). The case had been "cold" for many months before Evans came forward. Based on the information Evans provided, Pickett and Edmondson focused on Edwards as a suspect and later obtained search warrants, including a warrant to search Edwards's car. At trial, Pickett discussed Evans's statements to explain the next steps in his investigation, not to prove the truth of the matter asserted. Accordingly, Pickett's testimony was "not hearsay and [was] therefore admissible." *Id.* Therefore, the trial court did not abuse its discretion by overruling Edwards's hearsay objections. Moreover, because Evans and Dukes both testified at trial and were subject to cross-examination, the Confrontation Clause posed no barrier to Pickett's testimony regarding their out-of-court statements. *Crawford v. Washington*, 541 U.S. 36, 59 n.9 (2004).

¶26. As noted above, Edwards also argues that the trial court erred by allowing Pickett and Edmondson to testify that "postal workers" had complained about a gold or tan car blocking

10

their parking lot on the morning of the shooting. Specifically, over Edwards's objection, Pickett testified that Evans's statement that he had seen Edwards in a gold-colored car near the courthouse "was very important" to the investigation because law enforcement knew that "some . . . postal workers" had seen a vehicle "like" the car that Evans "described" to them. During a bench conference, Edwards argued that Pickett's testimony violated his "right of confrontation" because he had no "ability to cross-examine" the absent postal workers.[6] In response, the State argued that Pickett's testimony was admissible to show that the information they received from Evans "corroborated other evidence *and why it sent them in the direction*" of focusing on Edwards as a suspect. (Emphasis added). The State further argued that the testimony helped to explain that law enforcement "didn't [just] take [Evans] at his word and run with it." Finally, the State argued that the information was significant to Pickett and the investigation because the description of the car and the shooter's location were never "released to the public." The trial court overruled Edwards's objection, and Pickett was allowed to testify that based on all the information they had obtained, they arrested Edwards and obtained a warrant to search his car.

¶27. Edwards argues that similar testimony by Agent Edmondson was also unfairly prejudicial. Edmondson explained that before Evans came forward, the case had grown "cold." According to Edmondson, the information Evans provided was significant to the investigation because on the morning of the shooting, "postal workers had complained about

---

[6] In the course of Agent Edmondson's cross-examination, Edwards's attorney asked, "Did the post office [sic] testify about seeing [Edwards's] car?" Edmondson answered, "He could not testify due to a medical complication." In response to another question on cross-examination, Edmondson also identified one "postal worker" by name.

a gold or tan car blocking the entrance to the parking lot where they parked their box trucks used for delivering mail," which was "right next to the abandoned building." Edmondson testified that the postal workers' complaints, Dukes's statements to law enforcement, Wright's prior representation of Edwards, and other information obtained during the investigation all tended to corroborate Evans's statements and led the investigative team to arrest Edwards and obtain a search warrant for Edwards's car.

¶28. As noted above, the State argued that Pickett's testimony about what the postal workers had reported was admissible to explain "why it sent [law enforcement] in the direction" of focusing on Edwards as a suspect. This is a permissible non-hearsay purpose for offering such testimony. *Dukes*, 369 So. 3d at 562-63 (¶35). Therefore, the trial court did not abuse its discretion by admitting the testimony for the non-hearsay purpose of explaining why Pickett and Edmondson "did what [they] did as [they] proceeded with [their] investigation." *Id.* at 563 (¶35).

¶29. Moreover, the admission of the testimony for this purpose is constitutionally permissible because "the Confrontation Clause . . . has no application to out-of-court statements that are not offered to prove the truth of the matter asserted." *Williams v. Illinois*, 567 U.S. 50, 57-58 (2012). As the United States Supreme Court held in *Crawford*, the Confrontation Clause "does not bar the use of [even] testimonial statements for purposes other than establishing the truth of the matter asserted." *Crawford*, 541 U.S. at 59 n.9; *accord Batiste v. State*, 121 So. 3d 808, 851-52 (¶¶98-100) (Miss. 2013) (holding that the admission of testimonial hearsay did not violate the Confrontation Clause because it was

12

offered to establish motive, not to prove the truth of the matter asserted). Accordingly, because the out-of-court statements were not offered or admitted for the truth of the matter asserted, the admission of the challenged testimony did not violate Edwards's rights under the Confrontation Clause. *Crawford*, 541 U.S. at 59 n.9.

¶30. Nevertheless, Edwards argues that the trial court's ruling was inconsistent with the Mississippi Supreme Court's decisions in *Bridgeforth*, 498 So. 2d at 799-800, and *Franklin v. State*, 136 So. 3d 1021, 1030-32 (¶¶31-41) (Miss. 2014). To address Edwards's argument, we briefly discuss the relevant facts and holdings in *Bridgeforth* and *Franklin*.

¶31. In *Bridgeforth*, a defendant charged with armed robbery argued that the trial court erred by admitting the hearsay testimony of two detectives. *Bridgeforth*, 498 So. 2d at 799-800. One detective was allowed to testify over the defendant's hearsay objections that "[i]n the course of [his] investigation," he "learned that Alonzo Bridgeforth, Manuel Bridgeforth and Tony Lorenzo Bobo were responsible for the robbery." *Id.* at 799. It appears that the detective never elaborated or explained how he "learned" the identity of the perpetrators; rather, he was allowed to state a bald conclusion that his investigation established that the defendant and two others were guilty. *Id.* In addition, another detective was allowed to testify that interviews and other "investigative work" "corroborate[d] the information and statements given by" two alleged accomplices, including the State's primary witness at trial (Felix). *Id.* Neither detective testified as to how, if at all, the investigation was influenced by any of the out-of-court statements they related to the jury. *Id.*

¶32. On appeal, our Supreme Court stated that it had "repeatedly condemned the use of

13

hearsay testimony by officers obtained by way of investigation." *Id.* at 800. The Court also stated that officers should not "testif[y] to the results of their investigations and as to what other people told them and pointed out to them in the course of their investigations." *Id.* The Court held that the detectives' testimony should have been excluded because it was "apparent from the lack of direct evidence in [the] case, except through the testimony of accomplice Felix,"[7] that the testimony was offered "not for the purpose of showing the information upon which those detectives acted but in an effort to prove the truth of the matter asserted in the statements and to bolster its case." *Id.*

¶33.    In *Franklin*, a prosecution for kidnapping and aggravated assault, an officer testified that the defendant's uncle urged him to intervene "before [the defendant] killed [the victim]." *Franklin*, 136 So. 3d at 1028 (¶21). The officer also testified that the uncle told him that he had seen the defendant "holding [the victim] by the hair" and that the victim "had asked [the uncle] for help." *Id.* The trial court overruled the defendant's hearsay objections on the ground "that the statements were offered to show why the officer acted as he did," not to prove the truth of the matter asserted. *Id.* at 1029 (¶23). The Supreme Court held that the trial court did not err by admitting the testimony. *Id.* at 1030 (¶30). The Supreme Court also distinguished *Bridgeforth*, stating: "[T]his Court based its finding of improper bolstering in *Bridgeforth* on 'the lack of direct evidence' to support the case. Comparatively, there is

---

[7] *Bridgeforth*'s emphasis on the paucity of "direct evidence" in that case appears to refer to the distinction between direct and circumstantial evidence. In *Nevels v. State*, 325 So. 3d 627 (Miss. 2021), our Supreme Court made clear that "the law makes no distinction between direct and circumstantial evidence" and therefore abolished the use of "circumstantial evidence instructions" in purely circumstantial cases. *Id.* at 634 (¶20) (quoting *Mack v. State*, 481 So. 2d 793, 797 (Miss. 1985) (Robertson, J., concurring)).

extensive direct evidence in the case sub judice; therefore, Franklin's claim of improper bolstering is without merit." *Id.* at 1030 (¶29) (citation and ellipses omitted) (quoting *Bridgeforth*, 498 So. 2d at 800).

¶34. This case is more comparable to *Franklin* than to *Bridgeforth*. Here, the State presented "direct evidence" of Edwards's guilt, including a confession. *Id.* As discussed above, Edwards's own brother testified that Edwards stated, "I shot the MF judge."[8] In addition, both Evans and Dukes testified that Edwards "just smiled" when Evans directly accused him of shooting Judge Smith. Edwards's silence in the face of such an accusation may be viewed as a "tacit admission" or an "admission by silence." *Rogers v. State*, 928 So. 2d 831, 839 (¶¶29-33) (Miss. 2006). The State also presented compelling circumstantial evidence, including ballistics evidence and Edwards's brothers' testimony tying Edwards to the rifle believed to have been used in the shooting. Moreover, unlike the detectives in *Bridgeforth*, Pickett and Edmondson explained to the jury how the out-of-court statements influenced the next steps in their investigation. Given the overall strength of the State's case, we cannot say that "[i]t is *apparent . . .* that the State introduced the [testimony regarding the postal workers] not for the purpose of showing the information upon which [Pickett and Edmondson] acted but in an effort to prove the truth of the matter asserted in the statements and to bolster its case." *Bridgeforth*, 498 So. 2d at 800 (emphasis added). Rather, we

---

[8] "The 'confession' which constitutes direct evidence of a crime is not limited to a confession to a law enforcement officer but also includes an admission made to a person other than a law enforcement officer." *Ladner v. State*, 584 So. 2d 743, 750 (Miss. 1991). *Ladner* involved the denial of a "circumstantial evidence instruction." *Id.* As noted above, *Nevels*, 325 So. 3d at 634 (¶20), held that such instructions are no longer required.

conclude that the trial court did not abuse its discretion by admitting the testimony to explain why Pickett and Edmondson "did what [they] did as [they] proceeded with [their] investigation." *Dukes*, 369 So. 3d at 563 (¶35).

## CONCLUSION

¶35. The trial court did not abuse its discretion by allowing the testimony at issue because it was offered for a legitimate, non-hearsay purpose. In addition, because Evans and Dukes were subject to cross-examination at trial and because the challenged testimony was not offered for the truth of the matter asserted, there was no violation of Edwards's rights under the Confrontation Clause.

¶36. **AFFIRMED.**

**BARNES, C.J., CARLTON, P.J., GREENLEE, WESTBROOKS, McDONALD, McCARTY, SMITH AND EMFINGER, JJ., CONCUR. LAWRENCE, J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.**